## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

Maryland Office of the Public
Defender,
301 Bay Street
Suite 308
Easton, Maryland 21601,

National Association for the
Advancement of Colored People –
Talbot County Branch,
Post Office Box 716
Easton, Maryland 21601,

Kisha Petticolas
301 Bay Street
Suite 308
Easton, Maryland 21601,

Richard M. Potter
6077 Landing Neck Road
Easton, Maryland 21601,

        Plaintiffs

v.

Talbot County, Maryland,
Serve on:
Clay B. Stamp, County Manager
Courthouse Wing South
11 North Washington Street
Easton, Maryland 21601,

        Defendant.

**COMPLAINT FOR
DECLARATORY, INJUNCTIVE,
AND MONETARY RELIEF**

**Civil Action No.: 1:21-cv-01088**

## NATURE OF THE CASE

By this action, Plaintiffs ask this Court to find and hold that a statue glorifying the Confederacy on the lawn of the courthouse in Talbot County, Maryland is both unconstitutional and illegal under federal law and the laws of the State of Maryland. That any government in the United States would continue to maintain the symbolism of white supremacy and promote a legacy of racial subjugation should shock the conscience. That Talbot County does so on a courthouse lawn—a place of prominence that holds itself out as the seat of justice in the county; a place that county citizens pay for and maintain with tax dollars, including the tax dollars of its Black citizens who are overtly denigrated and humiliated by the statue—only compounds the unconscionability of the statue and illuminates its illegality. The so-called "Talbot Boys" statue—an homage to traitors to the United States and to the State of Maryland, who fought to sustain the enslavement and subjugation of Black people and to tear apart the Union—cannot remain on government property consistent with the core promise of the Fourteenth Amendment to *all* Americans: equality under the law.

In August 2020, following years of pleas from the National Association for the Advancement of Colored People ("NAACP"), its members, county residents (Black, white, and others alike), and community faith leaders to move the statue from the courthouse, and in the face of renewed and increasingly emphatic demands and protests over the course of that summer from a Black-led coalition of activists calling for the statue's removal as necessary to combat racial inequity in the community, Talbot County willfully continued on the path of illegality. It doubled down on its commitment to white supremacy over racial equity when it refused, by majority vote of its governing council, to remove the statue, and then took steps to shut down further community debate about the matter.

2

Through this action, Plaintiffs Maryland Office of the Public Defender ("OPD"), NAACP – Talbot County Branch, OPD attorney Kisha Petticolas, and NAACP – Talbot County Branch President Richard Potter challenge Defendant Talbot County's acts and omissions as racially discriminatory and unlawful.

## BACKGROUND

1.      Talbot County is on the Eastern Shore of the Chesapeake Bay, approximately 90 minutes from both Baltimore and Washington, D.C. Often referred to as the "treasure" of the Eastern Shore, it bills itself as the "perfect balance of rural simplicity and urban refinement."[1] With more than 600 miles of picturesque waterfront, it attracts visitors from across the East Coast and is home to more than 37,000 residents.

2.      Easton is the largest city in Talbot County and the county seat. Once deemed the "Colonial Capital of the Eastern Shore," Easton is consistently named one of the "Top Ten Best Small Towns" in America. A popular cultural destination, Easton's quaint streets are filled with historical buildings and homes featuring architecture from the eighteenth and nineteenth centuries. It is known for its culinary scene, world-class theater, renowned art galleries, and curated museums.[2]

3.      But Easton is also known for something else: it is home to the last Confederate monument that remains on public property in Maryland outside of cemeteries and battlefields.[3] On the lawn of the Talbot County courthouse in Easton, just in front of the courthouse entrance,

---

[1] Talbot County, https://tourtalbot.org/talbot-county/ (last visited Apr. 20, 2021).

[2] *Id.*; Easton, Maryland, https://eastonmd.org (last visited Apr. 20, 2021).

[3] Casey Cep, *My Local Confederate Monument*, The New Yorker, Sept. 12, 2020, *available at* https://www.newyorker.com/news/us-journal/my-local-confederate-monument.

there is a 13-foot tall monument memorializing the Talbot Boys—a regiment from Talbot County that fought for the Confederacy in the Civil War. The Talbot Boys statue depicts a romanticized lone Rebel soldier gazing at the distance and holding a Confederate battle flag—a tribute to soldiers from Talbot County who fought for the losing side in the Civil War.

4.      Within the Talbot County courthouse reside the chambers and courtrooms for the judges of the Circuit Court for Talbot County, as do the clerk's offices, jurors' assembly room, the master's office, and offices of the Talbot County Council ("County Council" or the "Council"). Originally built in 1794, this stately structure features a courtyard with a brick pathway leading to the front doors and well-manicured lawns on each side. The Talbot Boys statue is prominently situated on the landscaped green south of the brick pathway on the very site where a slave auction block once stood.

5.      Every day, county and town employees, as well as members of the public—including defendants in criminal, civil, family, and juvenile cases; employees and clients of OPD; attorney Kisha Petticolas; members of the NAACP and others attending County Council meetings and other county-sponsored events—traverse the courtyard and pass the Talbot Boys statue as they enter the courthouse. For many of these visitors—defendants, jurors, witnesses, judges, and attorneys—the statue serves as an unavoidable, painful reminder every time they enter and leave the courthouse during a trial, hearing, or public meeting, of the hateful legacy of slavery and those who fought to preserve it. To Black Americans who enter the courthouse in particular, the statue sends an unmistakable message that justice is not blind, and that the law does not serve and protect them equally. That was the intent of the monument all along.

6.      Although some members of the County Council and some residents of Talbot County contend the statue is a "splendid work of art" that was erected merely to honor locals

4

who fought for the South and which should therefore remain as a memorial to those veterans, the timing and financing of the statue tell a different story. Erected 50 years after the Civil War had ended and during the Jim Crow era, the statue was funded primarily by a prominent white lawyer who had repeatedly made disparaging public remarks about Black Americans and embraced ideals of slavery. It is also telling that no monument was erected to honor the sacrifices of those from Talbot County who fought for the Union—particularly since Maryland was not part of the Confederacy. Against this backdrop, it is clear that the Talbot Boys statue, like numerous other Confederate monuments once standing across the country, was created to pay homage to a slave-owning society that lost the Civil War, and was principally intended to serve as an overt expression of white dominance over Black people.[4] In other words, though the Confederacy may have been defeated, and slavery outlawed, the erection of monuments like the Talbot Boys statue allowed the public glorification of white supremacy, and thus white supremacy itself, to live on.

7.     As a threshold matter, that history of racial discrimination is not a history worthy of glorification; rather, it is a history of treason and bigotry at odds with our founding document, the Declaration of Independence, and that document's promise that all men are created equal. But more to the point, it is not a history that government, using public resources, should or may continue to glorify as a legal matter. It would be unthinkable, for example, that any public courthouse in the United States could, consistent with the Equal Protection Clause and other federal and state anti-discrimination laws, fly a swastika flag on its front lawn. It would be equally unthinkable for a courthouse—or any government facility for that matter—to fly a

---

[4] Brian Palmer & Seth Free Wessler, *The Costs of the Confederacy*, Smithsonian Magazine, Dec. 2018, *available at* https://www.smithsonianmag.com/history/costs-confederacy-special-report-180970731/.

banner proclaiming men to be superior to women. And, of course, it would be unthinkable, not to mention unlawful, for a courthouse or any other government facility to hang a sign above the entrance stating explicitly that "In this building, white people are given priority over Black people."

8.      Symbolic tributes to the United States' history of slavery and the Confederacy's (and its sympathizers') defense of slavery, when embraced by units of government and paid for or maintained by tax dollars, are no less repugnant to our laws than overtly discriminatory text created or endorsed by government. The Talbot Boys statue says just this: "In this building, white people are given priority over Black people;" and "Justice for Black people means something different than what Justice means for white people means." To view it differently is to ignore objective fact.

9.      There is an important place for the study of the history of slavery and of the Confederacy in our academic texts and in museums and at historic battlefields, where the iconography of racism, treason, cowardice, and class subjugation can be properly contextualized and explained.

10.      Individuals who view the Confederacy and the legacy of slavery and white supremacy with fondness are free to do so and express their views, but units of government may not participate in supporting those views. The lawn of a public courthouse may not, consistent with our laws, be used to pay tribute to a racist history and its defenders.

11.      The Talbot Boys statue, as with Confederate symbols generally, also threatens public safety. This became even more evident on January 6, 2021, when a massive group of insurrectionists, some of whom carried Confederate battle flags, stormed and lay siege to the United States Capitol building during the counting of Electoral College votes to confirm the

6

winner of the 2020 Presidential Election. Those traitors and would-be usurpers of democracy threatened the lives of members of the United States Congress and of the Vice President, and caused the death of several members of the Capitol Police as the police force tried to defend Congress and the Capitol. As the New York Times reported: "Amid the images and videos that emerged from Wednesday's rampage, the sight of a man casually carrying the Confederate battle flag outside the Senate floor was a piercing reminder of the persistence of white supremacism more than 150 years after the end of the Civil War."[5] The Talbot Boys statue on the Talbot County courthouse lawn represents kindred traitors and white supremacists, and serves, and was intended to serve, the exact same purpose as the Confederate flags carried by the present-day traitors and white supremacists who stormed the Capitol just a few short months ago.

12.     Adding greatly to its offensive and threatening character is the location of the Talbot Boys statue—on courthouse property, prominently erected mere feet from the main entrance. At their noblest, courthouses are the visual embodiments of the rule of law and values of the community, reflecting the "the beliefs, priorities and aspirations of a people."[6] Yet, by allowing the Talbot Boys statue to remain on the courthouse lawn, Talbot County sends a message that the community does not value Black people, that justice is not blind, and that Black people are not equal in the eyes of the county. For Black employees and litigants entering the courthouse, the statue is, in its least damaging capacity, intimidating and demoralizing. In very real terms, though, it leaves many defendants feeling as if they do not have a chance to receive

---

[5] Maria Cramer, *Confederate Flag an Unnerving Sight in Capitol*, The New York Times (Jan. 9, 2021), https://nytimes.com/2021/01/09/us/politics/confederate-flag-capitol.html.

[6] Lewis F. Powell, Jr., *Virginia's Historic Courthouses* (John O. and Margaret T. Peters, authors) foreward (University of Virginia Press, 1995).

fair and unbiased adjudication of their cases. Moreover, the presence of the statue creates an atmosphere of acceptance of white supremacy values that is conducive to inciting violence, equivalent to what the Nation witnessed on January 6, 2021, at the United States Capitol.

13.    The Talbot Boys statue threatens public safety, is discriminatory, and creates a hostile work environment, especially for the courthouse's Black employees. Accordingly, Plaintiffs ask this Court to declare that the Talbot Boys statue cannot lawfully remain on the courthouse lawn and must be removed. In the words of United States Senator Christopher J. Van Hollen Jr. (Dem. Md.), who recently voiced support for removal of the Talbot Boys statue: "We have an obligation to build a more perfect union, not honor those who fought to dissolve it."

14.    In refusing to remove the statue, Talbot County is actively and unlawfully discriminating against Plaintiffs.

## PARTIES

15.    **Plaintiff Maryland Office of the Public Defender ("OPD").** OPD is an independent state agency, created in 1971 by the Maryland legislature, charged with securing justice, protecting civil rights and liberty for people facing criminal prosecution, with the mission of using a client-centered approach to ensure "Justice, Fairness, and Dignity for All." A Board of Trustees, composed of 13 members, appoints the Public Defender (who serves a six-year term), and advises on the operations of the public defender system. Attorney Paul DeWolfe currently holds the position of State Public Defender. OPD has 12 districts and maintains at least one district office in each county and in the City of Baltimore. The district offices provide legal services to defendants in felony, misdemeanor, traffic, and juvenile delinquency actions where a defendant may be subject to incarceration or detention. The public defender's office provides representation at arraignments, bail review, preliminary hearings, pre-trial motions, trial,

8

sentencing, post-sentencing, and violations of probation and parole. OPD also has different divisions that provide representation to defendants in different types of proceedings, including appeals, post-conviction proceedings, parental defense, mental health defense, juvenile protection, forensics, and the Innocence Project. Talbot County is in the Third District. Four of OPD's six full-time employees in the Talbot County office are Black, including attorney Kisha Petticolas, whose work routinely requires her to be at the Talbot County courthouse. As with all of its defendant clients, OPD represents Black defendants in various legal actions in Talbot County, and they must also appear in court in the Talbot County courthouse. OPD brings this action on behalf of itself and its employees and clients, seeking to ensure that it fulfills its own mission and abides by constitutional and legal requirements guaranteeing legal representation to those whom it represents and equal protection of the laws to those whom it employs and represents. Defendant's acts and omissions thwart OPD's ability to meet both its mission and its legal obligations in Talbot County by forcing it to subject OPD employees at a place of work and OPD clients appearing at the courthouse to a monument to white supremacy.

16.     **Plaintiff National Association for the Advancement of Colored People –**
**Talbot County Branch ("NAACP" or "NAACP – Talbot County Branch").** The NAACP is a non-profit, non-partisan corporation with over 300,000 members, including approximately 150 residing in Talbot County. It is the nation's largest and oldest grassroots-based civil rights organization. The NAACP's mission includes "eliminat[ing] racial hatred and racial discrimination." Richard Potter is the current President of the Talbot County branch of the NAACP. The members of the NAACP – Talbot County Branch reside and pay taxes in Talbot County. The NAACP – Talbot County Branch brings this action on behalf of itself and its members, including members who work and have business at the county courthouse, who are

affronted on a daily basis by Talbot County's continued celebration of white supremacists at a place that is supposed to stand for justice and equality.

17.     **Kisha Petticolas** is Black and is an attorney employed by OPD in Talbot County. Through her job as a public defender in Talbot County, Ms. Petticolas regularly represents clients, some of whom are Black, charged with criminal offenses and facing loss of liberty in proceedings at the Talbot County courthouse. As such, Ms. Petticolas' "workplace" includes the Talbot County courthouse, in addition to OPD's Bay Street offices. Due to Defendant's erection and continued maintenance of a racist statue at her workplace, Ms. Petticolas has suffered and continues to suffer racial discrimination on the job, which Defendant's actions have rendered her employer powerless to rectify. Further, Defendant's actions and omissions have compromised and continue to compromise Ms. Petticolas' ability to fulfill her job of providing "Justice, Fairness, and Dignity" to her clients, in keeping with OPD's mission, as well as ethical and licensing requirements for Maryland lawyers. It is simply not possible for Ms. Petticolas to protect the dignity of her Black clients or assure fairness for them at the Talbot County courthouse in the shadow of Defendant's statue celebrating white supremacy. Ms. Petticolas sues in her individual capacity as a Black attorney who regularly is required to work at or in the Talbot County courthouse.

18.     **Richard M. Potter** is Black and is the President of the NAACP – Talbot County Branch. A "son" of Talbot County, Mr. Potter grew up just blocks from the courthouse, and the Talbot Boys statue has been engrained in his life since his childhood, when he would cross through the courthouse lawn to visit the grocery store from his grandparents' home a block away. Through his position with the NAACP and in his personal capacity, Mr. Potter has been directly involved in seeking the removal of the statue since 2015. To Mr. Potter, the statue manifests

constant, blatant racism, sanctioned by the government. It is a harsh physical reminder that Black

people's voices and opinions are meaningless to the Council and to Defendant, amplified by

lawn signs currently appearing around Talbot County telling those who dislike the statue to just

"move." The statue, which all members of the public must pass to enter the Talbot County

courthouse for any personal business in one of its many government offices, such as the Register

of Wills, or to attend County Council meetings—which Mr. Potter does frequently both as a

concerned resident and in his capacity as President of the NAACP – Talbot County Branch—

sends a loud message to Mr. Potter that the government of Talbot County condones and even

encourages racial division. Because of Talbot County's continued support for the statue, Mr.

Potter feels as if the county in which he grew up is against him—that its leaders and defenders

would rather he and others who think as he does about the statue simply leave the county rather

than take a stand against the type of government-sponsored racism the statue represents.

19.     **Defendant Talbot County.** Talbot County was established around 1661 and

currently has a population of more than 37,000 people. Approximately 12.8% of residents in

Talbot County are Black.[7] Talbot County is governed by a five-member County Council, whose

members are elected at-large, and whose offices and meetings are located in the courthouse

building. The Council appoints all department heads including the County Manager, who serves

as the chief administrative officer of Talbot County. Talbot County is a "person" within the

meaning of 42 U.S.C. §1983 and a recipient of federal funding within the meaning of Title VI of

the Civil Rights Act of 1964 and its implementing regulations. Additionally, Talbot County is

responsible for control and maintenance of the building and grounds of the Talbot County

---

[7] U.S. Census Bureau, Quick Facts Talbot County, U.S. Census Bureau QuickFacts: Talbot
County, Maryland (last visited Apr. 20, 2021).

courthouse, which qualifies as a "public accommodation" within the meaning of Title II of the Civil Rights Act of 1964. Through its acts and omissions relating to its erection and maintenance of the Talbot Boys Confederate statue on the county courthouse lawn, Talbot County has injured and continues to injure Plaintiffs, as set forth herein.

## JURISDICTION AND VENUE

20.     This Court has subject-matter jurisdiction over Plaintiffs' action pursuant to 28 U.S.C. § 1331 because it raises issues arising under the United States Constitution and other federal laws. The Court may exercise supplemental jurisdiction over Plaintiffs' state law-based claims pursuant to 28 U.S.C. § 1367 because the claims are intertwined with Plaintiffs' federal claims and comprise part of the same case or controversy. Exercising supplemental jurisdiction will also avoid unnecessary duplication and multiplicity of actions and should be exercised in the interests of judicial economy, convenience, and fairness.

21.     OPD has standing to bring this action in its own capacity, as well as in its representative capacity on behalf of its employees and clients. First, OPD is injured as an entity because its mission to provide "Justice, Fairness and Dignity to All" is directly thwarted by the statue with respect to its work in Talbot County. As a government employer, OPD is required by the Constitution and civil rights laws to provide its staff with a fair and dignified work environment, free from race discrimination. OPD embraces these requirements and seeks to maintain a diverse, supportive and inclusive workforce throughout the state, but its ability to do so with respect to its staff in Talbot County is compromised by Defendant's unlawful celebration of racism and white supremacy through its maintenance of the Talbot Boys statue at the place where OPD employees work. Additionally, the location of the Talbot Boys statue on the lawn of the courthouse impedes OPD's ability to provide "Justice, Fairness, and Dignity" or the same

12

zealous representation to Black clients in Talbot County that it provides to other Black clients in the state. This is due to the understandable views of such clients that they cannot receive fair treatment by any judge or jury serving a court that champions on its front lawn a memorial to the racist legacy of the Confederacy, or fair representation from counsel who are part of a justice system that gives a home to the symbols of discrimination. These injuries to OPD, its employees, and clients are directly traceable to Talbot County's continued insistence on allowing the Talbot Boys statue to remain and will be redressed by the relief Plaintiffs seek from the Court in this lawsuit.

22.    The NAACP has standing to bring this action, in its own capacity and on behalf of its members, because, *inter alia*, the Talbot Boys statue promotes a legacy of racism and discrimination and impedes the advancement of and racial equality for Black people residing in or around, or visiting, Talbot County. In doing so, the statue directly impacts the organizational mission and objectives of the NAACP, causing the NAACP to spend resources on combatting the harm caused by the statue. That injury to the NAACP is directly traceable to Talbot County's continued insistence on allowing the Talbot Boys statue to remain and would be redressed by the relief Plaintiffs seek from the Court in this lawsuit. The NAACP has standing for the additional reason that one or more of its members, as described in this complaint, has suffered and continues to suffer injuries caused by the Talbot Boys statue; those injuries are directly traceable to Talbot County's continued insistence on allowing the Talbot Boys statue to remain; those injuries would be redressed by the relief Plaintiffs seek from the Court in this lawsuit; and no facts specific to any such individual member need be decided that would necessitate the participation of that individual member as a plaintiff in this lawsuit.

23.     The individual Plaintiffs have standing because, as Black people living or working in Talbot County, as professionals whose positions require them to work and conduct advocacy for their clients at, in, and proximate to the courthouse and the Talbot Boys statue, and as Black citizens who are direct victims of the legacy of racism and racial subjugation that the Talbot Boys statue both symbolizes and glorifies, they are directly injured by the existence of the statue on the courthouse lawn.

24.     Venue is proper and appropriate in this district under 28 U.S.C. § 1391(b)(2) because the events giving rise to this lawsuit occurred and continue to occur within Talbot County, Maryland.

## FACTUAL ALLEGATIONS

### A.     Slavery and Talbot County

25.     Before the Civil War, Talbot County had the tenth largest slave population in the state—nearly 4,000 people were enslaved in the county. [8] Easton's port had become a hub for the domestic trade slave, and the town's slave market was located on the very grounds where the courthouse and the Talbot Boys statue now stand. [9]

26.     Although Maryland was part of the Union in the Civil War, its Eastern Shore, including Talbot County, was a "hotbed" of Confederate sympathy. [10] When war broke out,

---

[8] Teri West & Kirstyn Flood, *Legacy of Slavery, Segregation Influences Debate Over Removing Confederate Statue in Maryland*, Capital News Service (June 15, 2020), https://cnsmaryland .org/2020/06/15/legacy-of-slavery-segregation-influences-debate-over-removing-confederate-statue-in-maryland/.

[9] *Id.*

[10] Casey Cep, *Emancipation*, AEON (Oct. 28, 2013), https://aeon.co/essays/shallow-buried-stories-of-slavery-still-haunt-my-home-county.

Talbot County was deeply divided, with scores of men fighting for both sides.[11] Indeed, many family members found themselves fighting against each other, although three times as many fought for the Union as for the Confederacy. [12]

27.     The starkest example of soldiers from Talbot County fighting against each other took place at the Battle of Gettysburg. There, the Union's First Maryland Eastern Shore Regiment was sent to Culp Hill to defend the Union line. Part of the Regiment, Company H, was comprised of soldiers from Talbot County.[13] At Culp Hill, the Regiment battled troops of the First Maryland Confederate Regiment, which also included men from Talbot County.[14] The color sergeants for each side were cousins, both from Talbot County.[15] The sergeant for the Confederacy was fatally wounded in the battle.[16]

28.     After the Civil War ended, even though Black Americans were no longer enslaved in Talbot County, they faced dire social and economic problems resulting from systemic racism. While a small group of Black Americans thrived in an isolated part of the

---

[11] *Id.*

[12] Teri West & Kirstyn Flood, *supra* note 8.

[13] The 2nd Maryland Infantry, U.S. & Maryland in the Civil War, http://www.2ndmdinfantryus.org/usinflES.html (last visited Apr. 20, 2021).

[14] Architectural Survey File (Apr. 5, 2005), https://mht.maryland.gov/secure/medusa/pdf/talbot/t-934.pdf.

[15] *Id.*

[16] *Id.*

county called Unionville—a self-sustaining village founded by formerly enslaved soldiers, where they built churches and schools and lived in unison with Quakers—the majority of Black Americans in Talbot County were subjected to prejudice and exploitation.[17] Instances of involuntary apprenticeships were common, and former slave owners frequently refused to return illegally bound children of former slaves to their parents.[18] Maryland also enacted Jim Crow laws as early as the 1870s, and there was a strong "color line" between whites and Blacks in Talbot County.[19] Beginning in the 1890s, there were lynchings, and Black people were frequently victims of other racial violence.[20] On April 21, 1919, an attempted lynching of a Black man named Isaiah Fountain took place on the grounds of the Talbot County courthouse, next to the then recently erected Talbot Boys statue.[21]

## B.    The Monument and the Circumstances Surrounding Its Creation

29.    The Talbot Boys statue was crafted in 1914, 50 years after the Civil War. It is prominently located on the courthouse lawn and glorifies local soldiers who fought for the

---

[17] Margaret L. Anderson, *Discovering the Past/Considering the Future: Lessons from the Eastern Shore*, A History of African Americans of Delaware and Maryland's Eastern Shore 93 (Carole C. Marks ed., 1996), *available at* https://archives.delaware.gov/wp-content/uploads/sites/156/2018/08/A-History-of-African-Americans-of-Delaware-and-Marylands-Eastern-Shore.pdf.

[18] *Id.* at 99.

[19] *Id*. at 89, 97.

[20] Ann Schmidt, *Black Civil War Vets Established Unionville 150 Years Ago,* Daily Mall (Jan. 25, 2018), https://www.dailymail.co.uk/news/article-5312669/Black-Civil-War-vets-established-Unionville-150-years-ago.html.

[21] *See Fountain v. State of Maryland*, 135 Md. 77, 77 (1919).

Confederacy.[22] The statue's origin traces directly back to the violence of Jim Crow, which followed post-Civil War Reconstruction. It was erected at a time when Confederate statues were used as a means of racial intimidation. Due to its size and prominent placement, for the past 100 years, everyone entering the courthouse through the main entrance has been forced to walk past the statue, including defendants, jurors, and witnesses in trials and hearings. For most of the past decade, the statue has shared the courthouse lawn with Frederick Douglass, who was born into slavery some 12 miles from where his statue stands and was jailed in the same courthouse and offered for sale in 1836 for attempting to flee slavery in Easton.[23]



---

[22] Cep, *Confederate Monument*, *supra* note 3.

[23] *See* Frederick Douglas, *The Life and Times of Frederick Douglas* (1881).

**The Monument**

30.    The monument consists of two parts: (1) a dark gray granite rectangular shaped pedestal; and (2) a six-foot tall copper statue of a young male soldier, which sits on top of the pedestal.



31.    The pedestal was erected in 1914 and bears the names of 96 Confederate soldiers with some connection to Talbot County. [24] The sides of the pedestal are highly polished and

---

[24] Cep, *Confederate Monument*, *supra* note 3.

inscribed with the names of the Confederate soldiers. The south side of the statue lists 42 names in two columns. It also features a bronze plaque with the inscription "CITIZENS AFTER WAR" followed by six names. The north side of the pedestal lists 26 names and has a plaque similar to the one on the south side, but listing only five names.[25]

32.     The copper statue was added atop the pedestal in 1916 and depicts a young solider carrying a Confederate battle flag that curls behind him, covering his back.[26] He wears a broad-trimmed hat, an open shirt, and a belt buckle with "C.S.A." carved into it. He stands on top of a wagon wheel.

33.     The front of the base is inscribed:

> To the Talbot Boys
> 1861–1865
> C.S.A.

## The Creation and Installation of the Monument

34.     The Talbot Boys statue was created, in part, through the efforts of Joseph B. Seth, an Easton lawyer, who sought to commemorate soldiers from Talbot County who fought for the Confederacy.[27] In 1914, Seth asked Colonel David G. McIntosh, a resident of Talbot County, to help him create a monument to honor Confederate soldiers from Talbot County.[28] Seth wrote:

---

[25] Architectural Survey File, *supra* note 14.

[26] *Id.*

[27] Justin Wm. Moyer, *Purge of Confederate Symbols Comes for Maryland's 104-year-old 'Talbot Boys' Statue*, Washington Post, July 3, 2020, *available at* https://www.washingtonpost.com/local/purge-of-confederate-symbols-comes-for-marylands-104-year-old-talbot-boys-statue/2020/07/02/f7b39edc-bbb3-11ea-86d5-3b9b3863273b_story.html.

[28] Teri West & Kirstyn Flood, *supra* note 8.

We had more men from this County to gain positions of high distinction than there were from any other County in the Country, either North or South. It is my desire to get away from the conventional soldier figure which is found on all of the monuments North and South, and to get an allegorical figure representing youth and courage.[29]

35.     At the time, other residents had engaged in parallel efforts to raise money to erect a Union monument; however, they were unsuccessful.[30]

36.     The Talbot Boys statue was dedicated in 1916 on Confederate Memorial Day (an unofficial holiday in June in Maryland).[31] In an article featured in the *Confederate Veteran* regarding the statue, Seth noted that Talbot County had "just pride in her contribution of men to the Confederate cause."[32]

37.     In a memoir Seth co-authored, he wrote "the bulk of the slaves were devoted to their masters and their families, taking great interest in everything concerning them." He continued, "[t]he families were equally devoted to the slaves and with the whole Southland had the tenderest affection for the faithful old Mammies and Uncles."[33]

38.     As Talbot County Council member Pete Lesher has acknowledged, Seth's "cringeworthy" language shows that the statue cannot "be seen as anything other than imbued with racism."[34]

---

[29] *Id.*

[30] Architectural Survey File, *supra* note 14.

[31] Justin Wm. Moyer, *supra* note 27.

[32] *Id.*

[33] *Id.*

[34] *Id.*

39.     At least 14 of the men whose names appear on the Talbot Boys statue owned slaves or belonged to slave-owning families, including the man whose name comes first: Admiral Franklin Buchanan, who married into the Lloyd family, which enslaved more than 700 people, including Frederick Douglass, at their Wye House plantation.

### Race Relations in Talbot County

40.     Like many places in the border states, Talbot County has a complicated relationship with its past. Home to the celebrated abolitionist Frederick Douglass, it is also home to the Wye House and Mount Misery, plantations where Douglass was enslaved and experienced the most brutal beatings of his life.[35] It is also home to Unionville, the only village in the United States founded by formerly enslaved soldiers. But less than a mile away is the Hanging Tree, where several Black people were allegedly lynched.[36]

41.     And, while race relations in Talbot County have improved significantly since the end of the Jim Crow era, there have been intermittent instances of hatred and violence, remnants of Talbot County's segregationist past. Black people also remain severely underrepresented in county government and excluded almost entirely from positions of prominence within the county's power structure.

- In 1919, not long after the Confederate monument was installed, a mob of some two thousand people surrounded the courthouse in an attempt to lynch a Black man named Isaiah Fountain, who was being tried for the alleged rape of a teenage girl.

- In 1924, another would-be lynch mob was thwarted only when a local baseball hero, John Franklin (Home Run) Baker, prevented its members from lynching a Black man accused of assaulting Baker's sister-in-law.

---

[35] Cep, *Emancipation*, *supra* note 10.

[36] *Id.*

21

- In 1957, the year after schools in Talbot County began to integrate, 800 whites came together to form the Talbot County Citizens Association, which picketed elementary schools with signs that read "Let's Keep Our Schools White." One of the first Black families to send their children to a white school—two little boys, ages six and seven—found a bomb on their front lawn in Easton, its seven-foot fuse burned to within a few inches of detonating.

- In 1986, four locals were arrested for burning a cross on the lawn of the only Black family on Tilghman Island. After they received their sentences, which ranged from community service to six months in jail, the Ku Klux Klan held a rally at the courthouse, to protest their treatment. By then, the Black family had already moved away from the Eastern Shore.

- In 1991, three Black employees of the Talbot County Roads Department, with the assistance of the ACLU, filed a lawsuit alleging "an unbroken pattern of racial discrimination, segregation, and harassment." They described supervisors segregating road crews, harassing Black workers with racial epithets, and denying minority employees opportunities for overtime work, promotions, and training. A U.S. District Court ordered Talbot County to pay a settlement and court fees—and to develop proposals to address racial discrimination in local government.

- For nearly 350 years, from the county's founding in 1661 until 2007, leadership of Talbot County government was entirely white, no Black person ever having been elected or appointed to the County Council or as County Manager. In 2007, Corey Pack was appointed as the first Black Councilmember in history, and he retained that position through several election cycles. To date, Councilman Pack remains the only Black person in Talbot County history to serve in the role.

- In 2019, Maryland State Police investigated and documented as an incident of hate/bias the distribution of racist literature in St. Michaels, which denigrated Black people and solicited residents to join the Ku Klux Klan.[37]

## C.      Removal and Relocation Efforts

42.      Over the past 20 years, there have been multiple efforts to remove and relocate the Talbot Boys statue. The movement began as a proposal to erect a different monument. In 2002, the Talbot Historical Society wanted to more prominently acknowledge Frederick

---

[37] "Racist KKK Pamplets Found On Driveways in Talbot County," WJZ Baltimore, *available at* Racist KKK Pamphlets Found On Driveways In Talbot County – CBS Baltimore (cbslocal.com).

Douglass' connection to Talbot County and proposed erecting a statue on the courthouse green to honor him. But when the historical society proposed the idea to the County Council, it was told by the Council that there was an "unwritten rule" that only veterans could be honored at the courthouse.[38]

43.     Dozens of local veterans opposed the Douglass statue on the basis of this *unwritten* rule. And, for a few months, the *Star Democrat*, Easton's local newspaper, was filled with letters to the editor debating whether it was appropriate to pay tribute to Douglass on the courthouse lawn.[39]

44.     When the Talbot County Council finally approved the Douglass statue in 2004, it did so by a single vote. But approval came with conditions, and it took years for the statue to come into existence. The Council rejected the first design for the Douglass memorial on the grounds that it was taller than the Talbot Boys statue. The Council stated that the county had adopted a policy that any "new statue would not exceed the proportions or dimensions of other statues."[40] The Council also maintained that "anyone who didn't die in a war would not be acknowledged as greater than those who did."[41]

---

[38] Cep, *Confederate Monument*, *supra* note 3.

[39] *Id.*

[40] *Id.*

[41] *Id.*

45.     It took another seven years for the Douglass statue to be erected. The entire statue is 11 feet tall—two feet shorter than the Talbot Boys statue.[42]

46.     After the Douglass statue was installed, residents began openly discussing whether the county, or any government, should continue to feature Confederate imagery in places of prominence, and what such monuments, including the Talbot Boys, conveyed about racial intolerance and division. These conversations came to a head in June of 2015, after a white supremacist who had repeatedly posed in pictures with the Confederate flag murdered nine people at the Emanuel African Methodist Episcopal Church in Charleston, South Carolina.

47.     Also in June of 2015, in the case of *Walker v. Texas Div. Sons of Confederate Veterans*, 576 U.S. 200 (2015), the Supreme Court of the United States endorsed the right of the State of Texas to ban Confederate flags from state-issued specialty license plates, holding that the government should be free to prohibit speech perceived by many as racist and offensive, and which the public might reasonably attribute to the State.

48.     Immediately following the *Walker* decision, Maryland Governor Larry Hogan decided that to promote racial unity, Maryland should follow Texas's lead and recall its own specialty license plates featuring the Confederate flag.[43] Because the Maryland plates had been the subject of prior litigation, the Maryland Governor and Attorney General sought a federal

---

[42] Contemporary Monuments to the Slave Past, https://www.slaverymonuments.org/items/show/1186#:~:text=Physical%20Dimensions-,Statue%20and%20base%3A%20132%20in,(335.28%20cm.) (last visited Apr. 20, 2021).

[43] Yvonne Wenger, *Hogan wants to recall Confederate plates in Maryland*, Baltimore Sun (June 23, 2015), *available at* https://www.baltimoresun.com/politics/bs-md-hogan-confederate-flag-20150623-story.html.

court's approval to discontinue and recall all state-issued Confederate flag plates. On October 15, 2015, federal judge Marvin Garbis granted the State's request to dissolve the prior injunction, thus allowing Maryland to recall the Confederate plates. "I look forward to the day when these plates are no longer on the road," Maryland Attorney General Brian Frosh said in response to the ruling. "This flag is a painful symbol that divides us, conjuring images of hate and subjugation. It has no place in any contemporary government use."[44]

49.     Immediately following the racist murders in Charleston, the Supreme Court's *Walker* decision, and Governor's Hogan's initiative to ban the Confederate flag from Maryland license plates, Plaintiff NAACP – Talbot County Branch asked the County Council to formally consider removing the Talbot Boys statue.

50.     In response to the NAACP's request, the county held a series of "listening sessions" through the summer and fall of 2015, where Councilmembers heard from impassioned activists, clergy, and the general public discussing the NAACP request for removal of the Talbot Boys. The Council also invited members of the public to submit information about their views on the issue in writing, and received many responses. Sentiment in Talbot County's Black community overwhelmingly favored removal of the statue. But because the county's Black population was almost entirely excluded from positions of prominence and power within the county government and business community, and the county was accustomed to disregarding the

---

[44] Ovetta Wiggins, *Maryland is likely to begin recalling license plates with Confederate flag images*, Washington Post, October 15, 2015, *available at* https://www.washingtonpost.com/local/md-politics/md-is-likely-to-begin-recalling-license-plates-with-confederate-flag-images/2015/10/15/296179ae-7384-11e5-9cbb-790369643cf9_story.html.

25

opinions of its Black residents, the Council conformed to habit and disregarded the wishes of the Black community.

51.     In November 2015, the Council held a private session vote and unanimously voted to reject the NAACP request and retain the Confederate monument at the courthouse. At a previously announced public meeting packed with attendees expecting the Council, following its many listening sessions, to finally discuss and debate the issue in a public forum, the Council instead simply announced that it had already voted privately and had decided unanimously to retain the monument at the courthouse. When the NAACP filed a complaint challenging the closed-door vote with the Maryland Open Meetings Compliance Board, the Board found the vote violated Maryland's open-meeting law. The Council then was forced to vote again, publicly, in the summer of 2016. But again, the Council voted unanimously to keep the monument on the courthouse lawn.

52.     A Council member tried to justify the vote by claiming the Council "felt it would be disrespectful to the family members of the Confederate relatives still alive in Talbot County." to remove the statue.[45]

53.     An online petition defending the monument in 2015 called it a "wonderful piece of artwork" built "in a spirit of sectional reconciliation." Petitioners claimed, "It is a piece of history and a splendid work of art that tells the story of brother vs. brother where North and South came together, the border state of Maryland" and indicated they "wish for it to remain in public view on the courthouse lawn."[46]

---

[45] Justin Wm. Moyer, *supra* at note 27.

[46] *Id.*

54.     In the years that followed, public sentiment in Maryland and across the country grew increasingly more disdainful of government endorsement of Confederate imagery, as instances of racism and violence associated with the Confederate flag in particular continued to recur. Repeatedly, these events triggered new rounds of letters, protests, and petitions demanding removal of the Talbot Boys: the removal of Confederate monuments in New Orleans, the murder of a counter-protester by a white supremacist in Charlottesville, the 200th anniversary of Frederick Douglass' birth, the removal of all other Confederate statues outside battlefields and cemeteries in the state of Maryland.

55.     Most recently, the murder of George Floyd, which sparked one of the largest public protests in the country's recent history, prompted approximately 1,000 people to join a Black Lives Matter gathering in Talbot County in June 2020, which ended with some attendees leaving their signs and placards at the Talbot Boys statue, including a sign at the feet of the statue that read: "Still???"

56.     Throughout, the decision-makers for the county—or, at least, a majority of them—have remained stubbornly unmoved by the injustice the statue promotes against Black people. However, Democratic Council member Pete Lesher (the only Democrat on the County Council and a descendent of some of those named on the statue) and Republican Council President Corey Pack (Talbot County's first and only Black Councilmember who five years earlier had voted to protect the monument) have, since the summer of 2020, voiced support for removing the statue on the grounds that it is no longer appropriate for public property. A resolution by Council President Pack to have the statue removed was introduced in June of 2020, along with other initiatives to promote racial unity and healing in Talbot County, drawing enormous support from residents throughout the community despite the COVID-19 pandemic.

27

57.     Although Council President Pack had strongly backed retention of the Talbot Boys monument as a member of the Council in 2015, conversations with constituents and unfolding events over the course of the intervening years had caused him to reflect upon the matter, and to have a change of heart. "As the heart changes, the mind must follow," he remarked in explaining his position advocating for removal of the statue.[47] Councilman Pete Lesher agreed: "The people of Talbot County today are more and more seeing this as a blot on the county. They are seeing it for what it is: a racist emblem that they have to walk by on the way into a courthouse."[48] Due to pronouncements like these from Pack and Lesher, Black Talbot County residents, including Mr. Potter, dared to believe their voices in opposition to the Confederate monument were finally being heard by some county leaders, their views respected and championed.

58.     Plaintiffs' hopes were soon dashed, however, by rude and disrespectful treatment of Mr. Potter by county officials when he tried to speak out on race equity issues at a Council meeting on June 23, 2020. On the agenda at the meeting were several measures proposed by Council and community members to address race equity concerns, including establishment of a formal "Diversity Statement" for county government, and institution of regular diversity trainings and assessments. The agenda also included a resolution—long sought by the NAACP – Talbot County Branch and other members of the community—concerning removal of the Talbot Boys statue. During the first portion of the meeting, Councilwoman Laura Price spoke in strong opposition to these race equity measures, declaring, as a white government official and business

---

[47] *Id.*

[48] *Id.*

owner, that Talbot County has no problem with racism, notwithstanding the views of the Black

Council President and Black community members that such problems do indeed exist.

Councilwoman Price dismissed the views of those who disagreed with her, expressly including

Pack. Indeed, in her remarks at the June 23 meeting, Councilwoman Price "accused Council

President Corey Pack, who introduced the measures, of 'reacting emotionally' to recent protests

against racial inequality across the country."[49] Councilwoman Price's remarks disappointed and

angered many, some of whom, including Mr. Potter, sought to voice their objections during the

meeting's public comments segment.

      59.     Due to the pandemic, Mr. Potter, like most members of the public, joined the June

23 meeting virtually, via telephone, to speak on behalf of the NAACP. After commending the

Council for its proposal to remove the Talbot Boys statue, Mr. Potter turned his attention to

Councilwoman Price's remarks opposing any vote on the diversity statement or training, and

claiming no racial issues exist in Talbot County, which he said he found "appalling." "*This has

got to stop!*" interrupted Councilwoman Price, in a piercing voice. Mr. Potter continued

nevertheless, noting the advantages of "white privilege" Councilwoman Price enjoys that seem

to blind her to the suffering of her Black constituents. At this, Councilwoman Price pushed back

her chair, grabbed her purse and snapped "I'm done." As she rose from her chair, and Mr. Potter

went on trying to speak, Councilwoman Price rudely spoke over him, demanding "if you don't

stop him, I'm leaving." Responding to Councilwoman Price, the clerk controlling the technology

---

[49] Candice Spector, *Civil rights group accuses Talbot Council of free speech snub*, Star
Democrat, July 2, 2020, *available at* https://www.stardem.com/news/local_news/civil-rights-
group-accuses-talbot-council-of-free-speech-snub/article_6f594fe8-814b-5898-91a1-
cfc1b2a9802b.html.

for the meeting said she was trying to "mute" Mr. Potter as quickly as she could, succeeding in this improper and unconstitutional effort to silence and censor the NAACP a few seconds later. Dismayed, Council President Pack then abruptly ended the meeting, later apologizing to Mr. Potter for any role he played in the Council's violation of his rights.

60.     Discussions on the resolution to remove the Talbot Boys statue continued through July and early August of 2020. At this point, Councilwoman Price stopped attending Council meetings in person, choosing to phone in, while all the other Council members attended. The public, however, was barred from attending in person, ostensibly due to the pandemic, although prior meetings had allowed public attendance with mask-wearing and social distancing measures. Nevertheless, dozens of residents and other members of the public addressed the Council remotely through comments at public meetings or submitted in writing. The overwhelming majority of attendees supported removal. This surge in local opposition to the government's continued endorsement of a Confederate monument echoes that occurring nationwide, equating it with government action widely considered racist and offensive, as detailed below in Section D.

61.     On July 28, the Council conducted a public hearing on the resolution advocating removal of the Talbot Boys statue. Of 32 members of the public who spoke, 27 urged the Council to vote for the resolution to remove the statue. Only four speakers urged that the statue be retained.[50] In addition, Council President Pack noted at the meeting that as part of the hearing, the county had received and would review a folder containing 13 pages of petitions urging removal, and a video, called "We Are Talbot" from Talbot County's Community Coalition on

---

[50] One speaker urged removal of all statues from the courthouse.

Diversity, Equity and Inclusion, featuring 55 Talbot County residents of all ages, races, and walks of life urging removal of the statue.[51]

62.     Against this local and national backdrop of surging public condemnation of government endorsement of Confederate imagery, the resolution to remove the Talbot Boys statue came to a vote on August 11, 2020, with expectations high among Plaintiffs, activists, and community members that the time had finally come for the statue to be removed from its place of prominence on the courthouse lawn. But in defiance of the overwhelming majority of public support in favor of removing the Talbot Boys statue, the Council voted 3-2 to retain the monument at the courthouse, with Councilmembers Frank Divilio, Laura Price, and Chuck Callahan opposing the removal resolution.

63.     Various community groups and leaders in Talbot County, including Plaintiffs NAACP, Potter, and Petticolas, have organized to protest the Talbot County Council's August 2020 vote and continue to voice strong opposition to the existence of the Talbot Boys statue on the courthouse lawn.[52] For example, the Move the Talbot Boys Confederate Monument Coalition has organized a group of over 500 members who have hosted rallies and presentations on the negative impact of the statue on the community during Talbot County Council meetings at the courthouse. Other community leaders, including a panel of faith leaders, have recently requested

---

[51] Available to view at https://www.facebook.com/watch/?v=2534985636812442.

[52] *Activists promise to continue fight against "Talbot Boys" Confederate monument*, The Washington Post, *available at* https://www.washingtonpost.com/local/activists-promise-to-continue-fight-against-talbot-boys-confederate-monument/2021/01/20/85823006-5214-11eb-bda4-615aaefd0555_story.html.

the Talbot County Council reserve time at future council meetings to address the issue.[53]

However, Talbot County Councilmembers Frank Divilio, Laura Price, and Chuck Callahan have

refused to hold these meetings in a public setting and have instead only stated that they would

consider meeting with interested constituents one on one.[54] Despite numerous requests by Mr.

Potter that the Council meet with NAACP leaders to discuss the matter, the Council majority has

refused those requests and shut out the NAACP, over the dissent of Councilmen Pack and

Lesher.

**D.      The Talbot Boys Statue's Presence on the Courthouse Lawn Causes Pain for Black Residents, Is Discriminatory, and Creates a Hostile Work Environment for OPD Employees, Specifically Including Plaintiff Kisha Petticolas.**

64.      There is a growing consensus in Maryland and beyond that it is unacceptable for

government entities to keep Confederate monuments on display.[55]

65.      In the past three and a half years, Maryland has removed four Confederate

monuments from public lands,[56] a statue of Roger Taney (the U.S. Supreme Court justice who

authored the famous *Dred Scott* opinion upholding slavery) has been removed from the state

---

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] Colin Campbell, *Baltimore's Confederate Statues Were Removed in the Dead of Night"*, Baltimore Sun (Sept. 26, 2019), *available at* https://www.baltimoresun.com/politics/bs-md-pol-confederate-monuments-20190926-3ionc4ekhrdllpp72uld7npzdm-story.html.

house grounds in Annapolis,[57] the Jeb Stuart Trail in Montgomery County (named for a Confederate Army general) was renamed the Northern Edge Trail,[58] and a plaque honoring a Confederate general has been removed from courthouse grounds in Wicomico County.[59] Most recently, the Maryland General Assembly voted to repeal the state song, which has been repeatedly denounced as "racist and unacceptable," with passage of the abolition bill unanimous in the Senate.[60]

66.    Maryland is not alone. At the federal level, the newly established bipartisan "Commission on the Naming of Items of the U.S. Department of Defense That Commemorate the Confederate States of America or Any Person Who Served Voluntarily With the Confederate States of America" has been tasked with "developing an implementation plan for renaming

---

[57] Brooks DuBose, *Two Years After Its Removal from Annapolis, Taney Statue Sits in Storage*, Baltimore Sun (Sept. 30, 2019), *available at* https://www.capitalgazette.com/maryland/ annapolis/ac-cn-taney-statue-20190926-20190930-hirgfzbu3zaylp7mbfkectquz4-story.html.

[58] Deb Belt, *Confederate Symbols Removed from Maryland in 2020, What Remains*, Patch (Feb. 27, 2021) https://patch.com/maryland/annapolis/confederate-symbols-removed-maryland-2020-what-remains.

[59] Jonathan M. Pitts, *A County on Maryland's Eastern Shore Quietly Takes Down a Confederate Memorial, After Years of Rejecting Idea*, Baltimore Sun (Jul 26, 2020), *available at* https://www.baltimoresun.com/maryland/eastern-shore/bs-md-salisbury-confederate-sign-20200724-hmlcbdh5gbgyza3viroy3awmjq-story.html.

[60] Brian White, *Enough is Enough: Maryland Votes to Repeal State Song, a Confederate Call to Arms; Bill Goes to Gov. Hogan*, Baltimore Sun (Mar. 30, 2021), *available at* https://www.baltimoresun.com/politics/bs-md-pol-maryland-state-song-20210330-5xape77xibfj7hfmvkavyqtbnu-story.html.

assets and removing symbols, displays, monuments, and paraphernalia that commemorate the Confederacy."[61]

67.     In Virginia, a statue of Robert E. Lee has been removed from the Virginia State Capitol.[62] Furthermore, and apropos of Plaintiffs' claims in this lawsuit, a Fairfax County, Virginia judge recently ruled that a Black defendant could not receive a fair trial in a courtroom decorated overwhelmingly with portraits of white judges, and thus ordered the trial moved to a courtroom without the paintings, because they served as "implicit symbols that suggest the courtroom may be a place historically administered by whites for whites, and that others are thus of a lesser standing in the dispensing of justice."[63] Meanwhile, another Virginia Circuit judge reversed his own previous order by ordering the removal of a portrait of Robert E. Lee from a Louisa County, Virginia courtroom because it "may impair the fair administration of justice."[64]

---

[61] Armed Services Committees Leadership Announces Selections for Commission on Removing Confederate Symbols and Names from U.S. Military Assets, Senate Armed Services Committee (Feb. 12, 2021), https://www.armed-services.senate.gov/press-releases/armed-services-committees-leadership-announces-selections-for-commission-on-removing-confederate-symbols-and-names-from-us-military-assets; https://www.congress.gov/bill/116th-congress/house-bill/6395/actions.

[62] Brian White, *supra* at note 60.

[63] *Commonwealth of Virginia v. Terrance Shipp, Jr.* No. FE-2020-8 (Va. Cir. Ct. Dec. 20, 2020), *available at* https://www.fairfaxcounty.gov/circuit/sites/circuit/files/assets/documents/pdf/opinions/fe-2020-8-cw-v-terrance-shipp-jr.pdf.

[64] Frank Green, *Judge Orders Lee Portrait Removed from Louisa County* Courtroom, The Daily Progress (Sept. 10, 2020), *available at* https://www.dailyprogress.com/news/state-and-regional/crime-and-courts/judge-orders-lee-portrait-removed-from-louisa-county-courtroom/article_1f8e7bc7-1cb4-5b03-8e2a-5d5688d428c4.html.

68.     And just this year, Mississippi—after years of holding out as the last state in the United States to feature the Confederate emblem on its flag—ratified a new state flag after retiring the old.[65]

69.     It is time for Talbot County to acknowledge what many other states and counties around the country have already recognized: Confederate statues and other Confederate symbols on public land send a highly inappropriate and demeaning message of state-sponsored racism at a time when the country is grappling with civil rights and equality in a manner not seen since the Civil Rights era of the 1960s. As Maryland's governor Larry Hogan recently stated, "While we cannot hide from our history—nor should we—the time has come to make clear the difference between properly acknowledging our past and glorifying the darkest chapters of our history."[66]

70.     The Talbot Boys statue is a symbol of oppression and honors slavery, secession, and white supremacy steps from the main entrance of the courthouse. It was erected 50 years after the Civil War in an era when the gains of Reconstruction were already being reversed, Jim Crow was entrenched, and revisionist public commemorations of the Confederacy were spreading across the country. It was also a time when Black Americans were being lynched on the Eastern Shore.[67] This symbol of hate and oppression—and which even in its most innocent

---

[65] Veronica Stracqualursi, *Mississippi Ratifies and Raises Its New State Flag Over the State Capitol for the First Time,* CNN (Jan. 13, 2021), https://www.cnn.com/2021/01/12 /politics/mississippi-new-state-flag-flown/index.html.

[66] Pamela Wood, *Hogan Calls for Taney Statue at Maryland State House to be Removed*, Baltimore Sun (Aug. 15, 2017), *available at* https://www.google.com/amp/s/www.baltimoresun. com/politics/bs-md-hogan-taney-statue-20170815-story.html%3foutputType=amp.

[67] Teri West & Kirstyn Flood, *supra* note 8.

interpretation only serves to glorify traitors to the United States and the State of Maryland—has no place in a public forum meant to represent fairness and justice.

71.     Black people and others have to pass the statue to get a marriage license, serve on a jury, attend and petition their county officials at Council meetings, and go to court. It is unconstitutional, immoral, and irresponsible to allow a monument that celebrates inequality, glorifies violence, and disregards the dignity of Black people to remain standing, in a place of prominence no less, outside the very courts and offices that purport to assure justice, fairness, and equality *to all*.

72.     Although defenders of the Talbot Boys statue insist it is a one-of-a-kind work of art that honors local soldiers for their sacrifice, this is objectively false. Not only is it a monument to treason, cowardice, and the glorification of a racist past, but it is not even unique. In reality it is a replica of a statue known as "The South's Defenders," a blatantly racist statue glorifying white supremacy that sat on the lawn of the Calcasieu Parish courthouse in Lake Charles, Louisiana, until—amid intense public debate—it was ripped down last August by Mother Nature, during Hurricane Laura.[68] Both statues were manufactured by the W.H. Mullins Company and dedicated within one year of each other at a time when white nationalists were determined to instill fear in, and exert control through intimidation over, Black Americans.

73.     The Talbot Boys statue remains for the same reason it was erected in the first place: white people in positions of authority embrace it as a glorification of a race-based order of

---

[68] Bill Chappell, *Hurricane Laura Rips Down 'South's Defenders' Confederate Statue in Lake Charles, La.*, NPR (Aug. 27, 2020), https://easternshorejournal.com/a-modest-proposal/; https://www.npr.org/sections/hurricane-laura-live-updates/2020/08/27/906717766/hurricane-laura-rips-down-south-s-defenders-confederate-statue-in-lake-charles.

class and racial superiority, however outdated, and unlawful, that glorification of racial superiority now plainly is in the United States.

74.     In light of the intent behind the Talbot Boys statue, its characteristics, its placement, and the deleterious and demoralizing impact it has in very real terms on the numerous employees, defendants, and other members of the public who enter the courthouse on a daily basis, the statue is discriminatory, demeaning, and hostile. It is not only cruel to allow the statue to remain in front of the courthouse, but also unlawful. OPD's Black clients are subjected to the presence of a monument that seeks to remind them of a time when they were legally a subordinate class not entitled to the constitutional right to a fair trial. And the jurors who are asked to judge the guilt or innocence of OPD's clients with impartiality are forced to endure the monument's imposing glare as they enter the courthouse, and may even question the sincerity of the impartiality the court asks them to bring to their deliberations in light of what the statue on the courthouse lawn symbolizes.

**E.     The Talbot Boys Statue on the Courthouse Lawn Injures Plaintiffs.**

75.     *Kisha Petticolas.* For nearly 14 years, Ms. Petticolas has worked in criminal law in Talbot County, first as a prosecutor, and then as a public defender—the job she currently holds. For nearly 14 years, therefore, Ms. Petticolas has, as an incident of her job, been obliged to pass by the Talbot Boys statue on a regular, sometimes daily, basis in order to do her job. For Ms. Petticolas, who even in 2021 is one of only a few Black attorneys in Talbot County, the statue is a personal affront to her as a Black person—a knife lodged in her soul, placed there by the county *because of* her DNA and the DNA of all Black people. The statue is a permanent reminder to Ms. Petticolas of stories her mother told her about Black men being taken from jail and hung and the time of "colored-only" and "white-only" spaces. The statue also directly

impacts her and her ability to perform her job, sitting as it does as a symbol of racism on the front lawn of a building that is supposed to serve as an institution of justice. Rather than instilling a sense of justice, the courthouse—itself a location historically associated with a hanging tree and an auction block on the very lawn where the statue now sits—causes Ms. Petticolas anguish not only for herself but also for her clients, especially her Black clients, because the statue and all that it represents makes it impossible for her clients to receive the full promise of equal rights and justice under the law. The statue tells Ms. Petticolas and her Black clients that, in Talbot County, the law is not equal for whites and Blacks precisely because the county values whites as superior to Blacks. The statue thus devalues Ms. Petticolas as a Black attorney and devalues her Black clients, and makes it impossible for her to execute her job as fully and effectively as she is called upon to do as a public defender.

76.     *Office of Public Defender*. Four of OPD's six full-time employees in Talbot County, including Ms. Petticolas, are Black. As an employer, OPD is charged by law to provide a workplace free of discrimination. As a legal services agency, OPD is charged with providing legal representation to clients accused by the government of having committed crimes, for which they will be judged under the law of their guilt or innocence. Because of the Talbot Boys statue, OPD is impaired in both respects. Given the obligation of Ms. Petticolas, for example, to attend court hearings and trials and other proceedings at the courthouse on a regular basis, OPD cannot provide Ms. Petticolas with a workplace free of discrimination. And because of the prominent placement of the statue before the entrance to the courthouse, OPD cannot provide its clients— certainly its Black clients—with the same measure of confidence in their legal representation that defendants would receive in a courthouse not adorned by racially charged symbolism. Even at her best, Ms. Petticolas could never be able to assure her Black clients that, within the Talbot

38

County courthouse, they will receive all of the due process and equal protection of the law to which they are entitled by the United States Constitution—not while the legacy of slavery and white supremacy is being glorified on the front lawn.

77.     *NAACP – Talbot County Branch*. The NAACP's mission includes "eliminat[ing] racial hatred and racial discrimination." The NAACP – Talbot County Branch has approximately 150 members residing in Talbot County, and for years has been speaking out against, and advocating for the removal of, the Talbot Boys statue. As an institution, the NAACP is harmed by the statue because the racism and legacy of white supremacy that it symbolizes is at the core of what the NAACP was created to fight. And its members—and at the very least its Black members—are harmed because they are the direct victims of the racist symbolism the statue embodies.

78.     *Richard Potter*. Richard Potter serves as the President of Talbot County Branch of the NAACP. Growing up in Talbot County, the Talbot Boys statue has been engrained in Mr. Potter's life since his childhood, when he would cross through the courthouse lawn to visit the grocery store from his grandparents' home a block away. He remembers marveling at the child on top and wondering why the statue was there, but no one told him of the institutional racism the statue represents. He first began to interact from an advocacy standpoint with the statue when the Frederick Douglass Honor Society wished to erect a statue of Frederick Douglass and encountered resistance from the Talbot County community leaders, who did not want the Frederick Douglass statue on the "sacred" courthouse lawn at all and then were emphatic that the Frederick Douglass statue could not be taller than the Talbot Boys. Through his position with the NAACP and in his personal capacity, Mr. Potter has been directly involved in seeking the removal of the statue since 2015, after he became enlightened to its true history. To Mr. Potter,

39

the statue is constant, blatant racism in his and the NAACP's face, sanctioned by the government. It is a harsh physical reminder that Black people's voices and opinions are meaningless to the Council and to the county, amplified by lawn signs being erected around Talbot County telling those who dislike the statue to just "move"—reminiscent of the 1950s-era signs saying "Let's Keep Our Schools White."



79.     The statue, which all members of Talbot County must pass to enter the courthouse to attend County Council meetings and for any personal business in one of its many government offices such as the Register of Wills, tells Mr. Potter that the government of Talbot County is giving license to and even encouraging racial divide. Mr. Potter has attempted to meet many times with the County Council to share his feelings about the statue as a Black man, but some members have refused to meet with him and no meeting has successfully led towards the removal of the statue. Moreover, since he became involved in seeking the statue's removal, Mr. Potter feels uncomfortable everywhere he goes. He feels as if the county in which he grew up is

against him—that they would like him to leave his childhood home if he cannot tolerate the pervasive racism for which the statue stands and which the vitriolic reactions to the calls for its removal have endorsed.

## CLAIMS FOR RELIEF[69]

### COUNT I
### Race Discrimination in Violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, Actionable Under 42 U.S.C. § 1983

80.    Plaintiffs incorporate by reference the factual allegations stated in paragraphs 1 through 79 above as if fully set forth herein.

81.    The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution prohibits the states from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

82.    The Equal Protection Clause of the Fourteenth Amendment thus prohibits states and state actors from discriminating on the basis of race or national origin or acting with a racially discriminatory purpose.

83.    Violations of the U.S. Constitution by local governments are actionable under 42 U.S.C. § 1983, which protects citizens against "deprivation of any rights, privileges, or immunities secured by the United States Constitution and laws" by persons acting under the color of law.

84.    Defendant Talbot County is a state actor for purposes of the Fourteenth Amendment and 42 U.S.C. § 1983. The erection and continued placement of the Talbot Boys

---

[69] Unless otherwise indicated, each count is brought by all Plaintiffs.

statue is the direct result of a custom, practice, or policy carried out by majority vote of the

County Council in which final decision-making authority is vested.[70]

85.     The placement of the Talbot Boys statue on the grounds of the courthouse in

Easton is facially discriminatory on the basis of race because the central plank of the

Confederacy was to protect and defend an economy and way of life premised on white

supremacy and the subjugation of Black Americans, manifested through the enslavement of

Black people. The statue's depiction of Confederate imagery, including a Rebel soldier with a

"C.S.A." belt buckle, a Confederate battle flag, and the inscription "C.S.A.," intentionally and

overtly invokes the spirit of that racially discriminatory set of values, no less offensive and

racially discriminatory than if Talbot County paid live humans to shout racial epithets or

installed a public address system through which racial epithets were aired 24 hours a day.

86.     In short, the statue says symbolically no less clearly than were it emblazoned on

the front entrance to the courthouse that Black people do not enjoy the "equal protection of the

laws."

87.     Moreover, the Talbot Boys statue on the grounds of the courthouse in Easton was

erected with a discriminatory purpose. The creation of the statue was spurred by the efforts of

Joseph B. Seth whose comments about the desire for the statue were imbued with racism. The

statue seeks to honor Confederate soldiers—including at least fourteen who either owned slaves

or belonged to slave-owning families—who fought on behalf of the Confederacy in its effort to

form a new nation predicated upon white supremacy and dedicated to the perpetual existence of

---

[70] *See generally Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978).

chattel slavery. A substantial and motivating purpose of erecting the statue outside the entrance to the courthouse was to intimidate Black residents based on their race.

88.     Black residents must walk past the Talbot Boys statue—a statue honoring those who fought to ensure their continued subjugation and enslavement—every time they enter the courthouse. These residents visit the courthouse to exercise their fundamental constitutional rights including to obtain marriage licenses, serve on juries, and access the judicial process. In addition, Black employees—including those of the Office of Public Defender—are required to stare down this symbol of hate, oppression, and racial discrimination in order to fulfill their duty and, in the case of OPD attorneys, uphold their clients' constitutional right to representation.

89.     Talbot County has no compelling interest in maintaining the Talbot Boys statue on the courthouse grounds.

90.     Defendant's actions and omissions in erecting and maintaining the Talbot Boys statue on the courthouse lawn directly and indirectly injures Plaintiffs by interfering with their rights to equal protection of the laws without regard to race, in violation of the Fourteenth Amendment to the U.S. Constitution, giving rise to their claims to relief under 42 U.S.C. §1983.

## COUNT II
### Violation of Fundamental Rights Arising Under the First and Fourteenth Amendment to the U.S. Constitution, Actionable Under 42 U.S.C. § 1983

91.     Plaintiffs incorporate by reference the factual allegations stated in paragraphs 1 through 79 above as if fully set forth herein.

92.     The rights to petition the government for redress of grievances and to access the courts and the judicial process are fundamental rights guaranteed by the First and Fourteenth Amendments.

93.     Violations of the U.S. Constitution by local governments are actionable under 42 U.S.C. § 1983, which protects citizens against "deprivation of any rights, privileges, or immunities secured by the United States Constitution and laws" by persons acting under the color of law.

94.     Defendant Talbot County is a state actor for purposes of the Fourteenth Amendment and 42 U.S.C. § 1983. The erection and continued placement of the Talbot Boys statue is the direct result of a custom, practice, or policy carried out by majority vote of the County Council in which final decision-making authority is vested.[71]

95.     Talbot County's placement of the Talbot Boys statue on the courthouse grounds—outside the primary building where the County Council meets and where the court system operates—deprives its Black residents, in particular, of the equal exercise of their protected rights to petition their government and to access the judicial process as a result of their having to walk by and stare down the Talbot Boys statue representing the Confederate cause of slavery and white supremacy any time they are required to enter the courthouse—for example, to answer for criminal charges, to attend County Council meetings, or even just (if married but seeking a divorce) to petition for a divorce.

96.     Talbot County's interference with the fundamental rights to petition and to access judicial process is not justified by a sufficient purpose.

97.     Defendant's actions and omissions in erecting and maintaining the Talbot Boys statue on the courthouse lawn directly and indirectly injures Plaintiffs by interfering with their

_____

[71] *See generally Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978).

44

rights to petition and to equal access to the courts, in violation of the First and Fourteenth Amendments to the U.S. Constitution, giving rise to their claims to relief under 42 U.S.C. §1983.

**COUNT III**
**Race Discrimination in Violation of Title II of the Civil Rights Act of 1964, 42 U.S.C.**
**§ 2000a**

98.     Plaintiffs incorporate by reference the factual allegations stated in paragraphs 1 through 79 above as if fully set forth herein.

99.     Talbot County is subject to the federal Civil Rights Act, 42 U.S.C. § 2000a *et seq*.

100.     Under the Civil Rights Act, "[a]ll persons…[are] entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation…without discrimination or segregation on the ground of race, color, religion, or national origin."[72]

101.     A public park or recreational area is considered a place of exhibition or entertainment.

102.     The grounds of the Talbot County courthouse are equivalent to a public park or recreational area. Recent events or activities taking place on the lawn of the courthouse include a Veterans Day ceremony,[73] a Fourth of July community reading,[74] substance abuse awareness

---

[72] 42 U.S.C. § 2000a (a).

[73] *Veterans Day Ceremonies in Talbot*, The Star Democrat (Apr. 20, 2021), *available at* https://www.stardem.com/bonus/veterans_day/veterans-day-ceremonies-in-talbot/ article_6d8ed190-a348-5e29-9004-e8dbba18ef2a.html.

[74] *Frederick Douglass Honor Society's Fourth of July Community Reading,* Talbot County (July 4, 2020), https://tourtalbot.org/event/frederick-douglass-honor-societys-fourth-of-july-community-reading/.

events,[75] planting by the Talbot County Garden Club[76] and an annual Easter egg hunt.[77] A variety of protests and rallies,[78] including some related to the Talbot Boys statue itself,[79] also take place on the courthouse lawn.

103.     The aforementioned events and activities are examples of exhibitions to a passive audience or recreational activities for the amusement of patrons.

104.     Talbot County's placement of the Talbot Boys statue on the courthouse grounds operates to deprive its Black residents of the full and equal enjoyment of the courthouse grounds, including attending the various events that take place on the courthouse lawn in full view of the statue.

105.     The Talbot Boys statue's continued existence on the courthouse lawn is a daily affront to Talbot County's Black residents and serves to humiliate them through the discriminatory denial of equal access.

---

[75] *Talbot Goes Purple,* Mid Shore Behavioral Health (Sept. 4, 2019), https://www.midshorebehavioralhealth.org/event-details/talbot-goes-purple.

[76] *Talbot County Courthouse*, Talbot County Garden Club, https://talbotcountygc.org/activities/community-gardens/talbot-county-court-house-easton/ (last visited Apr. 20, 2021).

[77] *Easton's Annual Easter Egg Hunt,* Discover Easton, https://discovereaston.com/easter/ (last visited Apr. 20, 2021).

[78] Mike Sunnucks, *Back the Blue Rally Scheduled for Friday at Talbot County Courthouse*, The Star Democrat (Sept. 16, 2020), *available at* https://www.stardem.com/news/local_news/back-the-blue-rally-scheduled-for-friday-at-talbot-county-courthouse/article_9d22daab-31c1-53a4-87dd-283eeef97472.html.

[79] Camila Fernandez, *Protests Continue Over Confederate Statue at Talbot Co. Courthouse*, 47ABC (Aug. 15, 2020), https://www.wmdt.com/2020/08/protests-continue-over-confederate-statue-at-talbot-co-courthouse/.

106.     Defendant's actions and omissions in erecting and maintaining the Talbot Boys statue on the courthouse lawn directly and indirectly injures Plaintiffs, in violation of their rights under the Title II of the Civil Rights Act of 1964 to enjoy public accommodations free from race discrimination.

**COUNT IV**
**Race Discrimination in Violation of**
**Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d**

107.     Plaintiffs incorporate by reference the factual allegations stated in paragraphs 1 through 79 above as if fully set forth herein.

108.     Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

109.     Federal regulations implementing Title VI further provide that no program receiving financial assistance through the U. S. Department of Justice shall "utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respects individuals of a particular race, color, or national origin." 28 C.F.R. § 42.104 (b)(2).

110.     Defendant receives federal financial assistance and is subject to Title VI requirements.

111.     By its continued retention and maintenance of the Talbot Boys monument on the courthouse lawn, notwithstanding repeated complaints from community members that the monument offends them as racist, Defendant has engaged in and continues to engage in

discriminatory implementation of policies and practices in willful violation of Title VI and its implementing regulations.

## COUNT V
### Race Discrimination in Violation of 42 U.S.C. § 1981

112.    Plaintiffs incorporate by reference the factual allegations stated in paragraphs 1 through 79 above as though fully set forth herein.

113.    42 U.S.C. § 1981 guarantees to all U.S. citizens "the same right in every State," *inter alia*, "to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as enjoyed by white citizens."

114.    For the reasons described in this Complaint, Talbot County's placement of the Talbot Boys statue on the courthouse grounds deprives, or impedes the ability of, Black residents, including the individual Plaintiffs in this action and the employees and clients and members of the OPD and NAACP – Talbot County Branch, to the equal exercise of their protected rights, including their right to petition their government, their right to access judicial process, their right to answer for criminal charges, their right to attend County Council meetings, their right to seek a license for marriage or a petition for a divorce, and their right to sue, be a party to, or give evidence in a courthouse proceeding.

115.    In this manner, Black residents are not afforded by Talbot County "the full and equal benefit of all laws and proceedings" on par with that which the county affords white residents, in violation of 42 U.S.C. § 1981.

## COUNT VI
**Violation of the Maryland Constitution – Art. 24, Maryland Declaration of Rights, Equal Protection, and Due Process**

116.     Plaintiffs incorporate by reference the factual allegations stated in paragraphs 1 through 79 above as if fully set forth herein.

117.     Central to the Maryland State Constitution is the declaration that "no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."[80]

118.     Not only is the Talbot Boys statue a symbol of past and present discrimination against Black people, but it is an active instrument of it. Every judge, juror, and attorney who enters the Talbot County courthouse must pass by this symbol of governmental support for white supremacy. Additionally, every Black person who wishes to enter the courthouse to exercise other fundamental rights, such as the right to marriage by obtaining a marriage license, must pass by it, knowing its demeaning history and knowing that it attracts those who hold racist and white supremacist views. The Talbot Boys statue also results in racial stigmatization and division.

119.     The presence of the Talbot Boys statue next to the Talbot County courthouse is not necessary to promote a compelling government interest. Conversely, the presence of a symbol of racism and white supremacy next to an institution of justice is wholly inappropriate and is harmful to Black citizens of Maryland and of Talbot County in particular.

---

[80]  Maryland Declaration of Rights, Article 24.

120.     The Talbot Boys statue represents a continuing violation of Plaintiffs' rights to equal protection under the Maryland Constitution. Therefore, Plaintiffs seek an order granting injunctive relief and requiring immediate removal of the statue.

## COUNT VII
### Violation of the Maryland Constitution – Art. 44, Maryland Declaration of Rights, Allegiance to the United States

121.     Plaintiffs incorporate by reference the factual allegations stated in paragraphs 1 through 79 above as if fully set forth herein.

122.     Article 44 of the Maryland Constitution's Declaration of Rights states, "That the provisions of the Constitution of the United States, and of this State, apply, as well in time of war, as in time of peace; and **any departure therefrom, or violation thereof, under the plea of necessity, or any other plea, is subversive of good Government, and tends to anarchy and despotism**" (emphasis added).

123.     By erecting and maintaining the Talbot Boys statue on the county courthouse lawn, Talbot County celebrates and glorifies traitors to the United States who fought for secession from the Union notwithstanding the State of Maryland's constitutional allegiance to the United States. In so doing, Talbot County has and continues to subvert good government and its pledge of allegiance to the United States and to the State of Maryland, in violation of Art. 44 of the Maryland Declaration of Rights, injuring Plaintiffs and giving rise to their claims for relief under the Maryland Constitution.

## COUNT VIII
### Violation of the Maryland Constitution – Art. 15, Maryland Declaration of Rights, Use of Taxpayer Money

124.     Plaintiffs incorporate by reference the factual allegations stated in paragraphs 1 through 79 above as if fully set forth herein.

125.     Article 15 of the Maryland Constitution's Declaration of Rights states, "the General Assembly shall, by uniform rules, provide for the separate assessment, classification and sub-classification of land, improvements on land and personal property, as it may deem proper; and all taxes thereafter provided to be levied by the State for the support of the general State Government, and by the Counties and by the City of Baltimore for their respective purposes, shall be uniform within each class or sub-class of land, improvements on land and personal property which the respective taxing powers may have directed to be subjected to the tax levy; yet fines, duties or taxes may properly and justly be imposed, or laid with a political view **for the good government and benefit of the community**" (emphasis added).

126.     Article 15 of the Maryland Constitution guarantees taxpaying residents of Maryland, including Plaintiffs, a legal right to have the government spend their taxes for the benefit of the community, meaning on lawful and constitutional activities. Talbot County's expenditures on the maintenance and protection of the Talbot Boys statue violate multiple constitutional and statutory provisions, including those identified in this Complaint, and on this independent ground makes the continued maintenance and protection of the statue unconstitutional under the Maryland Constitution.

127.     The presence of the Talbot Boys statue in front of the Talbot County courthouse is a continuing violation of Plaintiffs' rights to have taxpayer funds used for lawful purposes under the Maryland Constitution.

## COUNT IX
### Tortious Interference With Contract
### (Brought by Plaintiffs OPD and Kisha Petticolas)

128.     Plaintiffs incorporate by reference the factual allegations stated in paragraphs 1 through 79 above as if fully set forth herein.

51

129.     Plaintiffs OPD and Kisha Petticolas have a valid employment contract. Through this contract, Ms. Petticolas is employed by OPD in its Talbot County office to provide representation to people charged with crimes by the State of Maryland in Defendant's legal system, thus requiring Ms. Petticolas to work frequently on location at the Talbot County courthouse. A condition of the employment relationship between OPD and Ms. Petticolas is that both parties abide by the Constitution and laws of the United States and the State of Maryland, including its civil rights and fair labor and employment practices laws.

130.     Plaintiffs aver, on information and belief, that Defendant is or should be aware of the contractual employment relationship between OPD and its employees in Talbot County, and further, that Defendant is or should be aware that some OPD employees are required to work at the Talbot County courthouse as an aspect of their jobs.

131.     Ms. Petticolas is deeply offended by Defendant's erection and continuing maintenance of the Talbot Boys statue at a regular place of her employment, as it conveys to her a white supremacist message that the county, and its Court system, continue to glorify the subjugation of Black people such as herself and many of her clients. Ms. Petticolas has raised concern with her employer that the statue is unacceptable at her workplace, suggesting that it impairs her ability to fulfill her obligation as an attorney employed by OPD to seek fairness and justice for her clients, and that it violates her right to enjoy a work environment free from racial debasement and discrimination. Plaintiff OPD agrees with Ms. Petticolas, and contends that by insisting on maintaining a Confederate monument at a courthouse where OPD employees are required to work, Defendant is tortiously interfering with the employment contract between it and Ms. Petticolas, by making it impossible for OPD to abide by the terms of its contract

52

obligating it to abide by laws requiring it to provide a workplace free from racial discrimination and hostility.

132.    Defendant's insistence on maintaining the Talbot Boys statue on the county courthouse lawn constitutes tortious interference with and impairment of Plaintiffs' contract, giving rise to their claim for relief under Maryland common law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendant and ask the Court to grant Plaintiffs relief as follows:

1.    Declare the acts alleged herein to be unlawful under the United States Constitution, the Maryland State Constitution, the statutes set forth above, and the common law set forth above;

2.    Order Defendant to remove, immediately and permanently, the Talbot Boys statue from the lawn, grounds, and area in front of or in proximity to the Talbot County courthouse;

3.    Permanently prohibit Defendant from erecting or maintaining the Talbot Boys statue for public display on the grounds of any property owned or managed by Defendant;

4.    Award Plaintiffs compensatory relief for the harms they have suffered and are suffering as a result of Defendant's unlawful actions;

5.    Award Plaintiffs their reasonable costs and expenses, including attorneys' fees, pursuant to 42 U.S.C. §1988; and

6.    Award all other legal or equitable relief as the Court deems just and proper.

Dated: May 5, 2021

Respectfully submitted,

/s/     Daniel W. Wolff

Deborah A. Jeon (Bar No. 06905)
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION OF MARYLAND
3600 Clipper Mill Road
Suite 350
Baltimore, MD 21211
410.889.8550 x 120
jeon@aclu-md.org

Daniel W. Wolff (Bar No. 19940)
David Ervin*
Kelly H. Hibbert (Bar No. 18347)
Eric Ashby*
CROWELL & MORING LLP
1001 Pennsylvania Avenue NW
Washington, D.C. 20004
Telephone: 202.624.2500
Facsimile: 202.628.5116
dwolff@crowell.com
dervin@crowell.com
khibbert@crowell.com
eashby@crowell.com

Suzanne Trivette*
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, NY 10022-2544
Telephone: 212.223.4000
Facsimile: 212.223.4134
strivette@crowell.com

Tiffanie McDowell*
CROWELL & MORING LLP
3 Park Plaza, 20th Floor
Irvine, California 92614
Telephone:  949.263.8400
Facsimile:  949.263.8414
tmcdowell@crowell.com

*Attorneys for Plaintiffs*

*Motion for leave to appear pro hac vice forthcoming*