**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| MARYLAND OFFICE OF THE PUBLIC DEFENDER, *et al.* | * | |
| | * | |
| Plaintiffs | * | |
| | * | |
| v. | * | Civil Action No.: 1:21-cv-01088-ELH |
| TALBOT COUNTY, MARYLAND | * | |
| | * | |
| Defendant | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**MEMORANDUM IN SUPPORT OF**
**DEFENDANT'S MOTION TO DISMISS**

Talbot County, Maryland, Defendant, by and through its undersigned counsel, submits this

Memorandum in Support of its Motion to Dismiss.

**TABLE OF CONTENTS**

INTRODUCTION AND SYNOPSIS OF THE COMPLAINT……………………………1

FACTUAL ALLEGATIONS OF THE COMPLAINT PERTINENT TO THE RESOLUTION OF THE MOTION TO DISMISS.......................................................2

ALLEGATIONS RELATED TO PLAINTIFFS' PURPORTED INJURIES ................................................................................................5

ALLEGATIONS OF THE COMPLAINT WHICH ARE IMPERTINENT TO THE RESOLUTION OF THE MOTION TO DISMISS ...............................................8

ARGUMENT...............................................................................................8

I.      STANDARD OF REVIEW......................................................................8

II.     PLAINTIFFS LACK STANDING ........................................................10

        A.      The Complaint Fails to Allege Injury in Fact ...............................................12

i

B.      The Complaint Fails to Allege Particularized Injury ....................................16

C.      The Issue of the Effect and Meaning of the Statue
        Is a Political Question Best Left To Resolution by a
        Branch of Government Other than the Judiciary ...........................................18

III.    PLAINTIFFS HAVE FAILED TO STATE ANY CLAIM UPON
        WHICH RELIEF CAN BE GRANTED .....................................................................20

        A.  Plaintiffs Fail to State a Claim of Violation
            of Their Rights to Equal Protection ...................................................................20

        B.  Count II Fails for a Lack of Allegations
            Necessary to Assert the Claim ...........................................................................20

        C.  Count III Fails for the Same Reasons as Count II ............................................21

        D.  Count IV is Also Subject to Dismissal
            Due to the Insufficiency of the Allegations .....................................................22

        E.  No Direct Cause of Action Exists Against the County
            Under 42 U.S.C. § 1981 .....................................................................................23

        F.  Plaintiffs' State Constitutional Equal Protection Claim
            Fails for the Same Reasons as Plaintiffs' Federal Equal
            Protection Claim ................................................................................................24

        G.  No Private Cause of Action is Engendered by Article 44 of the
            Declaration of Rights .........................................................................................24

        H.  There Has Been No Violation of
            Maryland Declaration of Rights Article 15 .......................................................25

        I.  The County is Immune From the Common Law Tort
            Claim in Count IX..............................................................................................26

IV.     ALL CLAIMS ARE BARRED BY LIMITATIONS ............................................. 27

CONCLUSION.................................................................................................................28

# <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**                                                                              **<u>Page</u>**

*Am. Legion v. Am. Humanist Ass'n*, ___ U.S. ___ 139 S. Ct. 2067,
 204 L. Ed. 2d 452 (2019) ...................................................................14

*Ash v. City of Duluth*, 331 F. Supp. 3d 935 (D. Minn. 2018) ................................23

*Austin v. City of Balt.*, 286 Md. 51, 405 A.2d 255 (1979) ....................................26

*Avery v. State*, 15 Md. App. 520, 292 A.2d 728 (1972) ........................................25

*Bradley v. Baltimore Police Dep't.*, 887 F. Supp. 2d 642 (D. Md. 2012) ............................24

*Branch v. McGeeney*, 123 Md. App. 330, 718 A.2d 631 (1998)...........................................24

*Burley v. Baltimore Police Dep't.*, 422 F. Supp. 3d 986 (D. Md. 2019) ..............................27

*Carney v. Adams*, __ U.S. __, 141 S. Ct. 493, 208 L. Ed. 2d 305 (2020) ............................16, 17

*Carter v. Univ. of Washington Sch. of Dentistry*,
2021 WL 1338482 (W.D. Wash. Apr. 9, 2021).....................................................27

*Daniel v. Paul*, 395 U.S. 298 (1969).....................................................................21

*DiPino v. Davis*, 354 Md. 18, 729 A.2d 354 (1999).....................................................26

*Doe v. Obama*, 631 F.3d 157 (4th Cir. 2011) .........................................................10

*Frankel v. Bd. of Regents of Univ. of Maryland Sys.*, 361 Md. 298,
 761 A.2d 324 (2000)...........................................................................................24

*Hansen v. City of Laurel*, 420 Md. 670, 25 A.3d 122 (2011) ................................27

*Heffner v. Montgomery Cty.*, 76 Md. App. 328, 545 A.2d 67 (1988)...................................27

*Hodges by Hodges v. Pub. Bldg. Comm'n of Chicago*,
 864 F. Supp. 1493 (N.D. Ill. 1994) ...............................................................23

*Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180 (4th Cir. 1999) .............27

*Kenly v. Huntingdon Bldg. Ass'n*, 166 Md. 182, 170 A. 526 (1934)....................................25

*Kravitz v. United States Dep't of Com.*, 336 F. Supp. 3d 545 (D. Md. 2018) ......................18

*Maryland v. United States*, 360 F. Supp. 3d 288 (D. Md. 2019) ...........................................12

*Mayor & City Council of Baltimore v. Trump*,
416 F. Supp. 3d 452 (D. Md. 2019) ................................................................. 9, 10, 18

*Moore v. Blibaum & Assocs., P.A.*,
693 F. App'x 205, (Mem)–206 (4th Cir. 2017) .......................................................13

*Moore v. Bryant*, 853 F.3d 245 (5th Cir. 2017) ...................................................15

*Murphy v. Edmonds*, 325 Md. 342, 601 A.2d 102 (1992) ....................................24

*Raines v. Byrd*, 521 U.S. 811, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) .............................19

*Renko v. McLean*, 346 Md. 464, 697 A.2d 468 (1997)...........................................24

*Rios v. Montgomery Cty.*, 386 Md. 104, 872 A.2d 1 (2005)....................................26

*Rucho v. Common Cause*, ___ U.S. ___, 139 S. Ct. 2484,
204 L. Ed. 2d 931 (2019) .........................................................................18, 19

*Stone v. Trump*, 400 F. Supp. 3d 317 (D. Md. 2019)...........................................15

*TransUnion LLC v. Ramirez*, No. 20-297, 2021 WL 2599472,
at *10 (U.S. June 25, 2021)...............................................................10, 17, 19

*U.S. Mortg. Co. v. Matthews*, 167 Md. 383, 173 A. 903, rev'd, 293 U.S. 232,
55 S. Ct. 168, 79 L. Ed. 299 (1934) ......................................................................25

*Zilichikhis v. Montgomery Cty.*, 223 Md. App. 158, 115 A.3d 685 (2015).........................26

## Constitutional Provisions

First Amendment ...................................................................................................16

Fourteenth Amendment ........................................................................................20

Article 15 of the Maryland Declaration of Rights ...............................................25

Article 24 of the Maryland Declaration of Rights ...............................................24

Article 44 of the Maryland Declaration of Rights ...............................................24

## Statutes

42 U.S.C. § 1981...................................................................................................23

42 U.S.C. § 1983...........................................................................................20, 23

iv

42 U.S.C. § 2000a ................................................................................................21

42 U.S.C. § 2000d ..........................................................................................22, 23

Md. Code, Cts. & Jud. Proc. Art. § 3-504(b)(1) ...............................................27

## **<u>Rules</u>**

Fed. R. Civ. Proc. 12(b)(1) ...........................................................................8, 12

Fed. R. Civ. Proc. 12(b)(6) ...................................................................................9

## <u>INTRODUCTION AND SYNOPSIS OF THE COMPLAINT</u>

Reduced to its essence, this lawsuit contends that the presence of the "To The Talbot Boys" memorial statue ("the Talbot Boys" or "the statue"), erected by the United Confederate Veterans on the lawn of the Circuit Court for Talbot County in 1916, allegedly injures Plaintiffs by perpetuating a theme of white supremacy. Talbot County ("the County") is the sole Defendant. Plaintiffs are the Maryland Office of the Public Defender ("OPD"), the National Association for the Advancement of Colored People – Talbot County Branch ("NAACP"), Ms. Kisha Petticolas ("Ms. Petticolas") and Mr. Richard M. Potter ("Mr. Potter"). Ms. Petticolas is an attorney and employee of the OPD, and Mr. Potter is the President of the NAACP – Talbot County Branch. The individual Plaintiffs reside in Easton, Maryland, the same municipality in which the courthouse is located.

The Complaint consists of nine (9) causes of action styled as follows:

COUNT I          Race Discrimination in Violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, Actionable Under 42 U.S.C. § 1983;

COUNT II         Violation of Fundamental Rights Arising Under the First and Fourteenth Amendment to the U.S. Constitution, Actionable Under 42 U.S.C. § 1983;

COUNT III        Race Discrimination in Violation of Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a;

COUNT IV         Race Discrimination in Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d;

COUNT V          Race Discrimination in Violation of 42 U.S.C. § 1981;

COUNT VI         Violation of the Maryland Constitution – Art. 24, Maryland Declaration of Rights, Equal Protection and Due Process;

COUNT VII        Violation of the Maryland Constitution – Art. 44, Maryland Declaration of Rights, Allegiance to the United States; and,

1

COUNT IX     Tortious Interference With Contract (Brought by Plaintiffs OPD and Kisha Petticolas).

Plaintiffs seek injunctive relief, compensatory damages and attorneys' fees, as follows:

1.     Declare the acts alleged herein to be unlawful under the United States Constitution, the Maryland State Constitution, the statutes set forth above and the common law set forth above;

2.     Order Defendant to remove, immediately and permanently, the Talbot Boys statue from the lawn, grounds and area in front of or in proximity to the Talbot County courthouse;

3.     Permanently prohibit Defendant from erecting or maintaining the Talbot Boys statue for public display on the grounds of any property owned or managed by Defendant;

4.     Award Plaintiffs compensatory relief for the harms they have suffered and are suffering as a result of Defendant's unlawful actions;

5.     Award Plaintiffs their reasonable costs and expenses, including attorneys' fees, pursuant to 42 U.S.C. §1988; and

6.     Award all other legal or equitable relief as the Court deems just and proper.

## FACTUAL ALLEGATIONS OF THE COMPLAINT
## PERTINENT TO THE RESOLUTION OF THE MOTION TO DISMISS

Solely for the purposes of this Motion, and without conceding the veracity of any of the allegations therein, the following factual allegations of the Complaint are accepted as true:

Talbot County is on the Eastern Shore of Maryland and is home to more than 37,000 residents. (ECF Doc. 1, ¶ 1). The City of Easton is the County Seat and the County Courthouse ("the Courthouse") is located in the City. (*Id*., ¶¶ 2, 3). On the lawn of the County Courthouse is a 13-foot tall monument memorializing the "Talbot Boys"—a regiment from the County that fought for the Confederacy in the Civil War. (*Id*., ¶ 3). Within the Courthouse reside the chambers and courtrooms for the judges of the Circuit Court, as do the clerk's offices, jurors' assembly room, the master's office, and offices of the Talbot County Council ("County Council" or "Council").

(*Id.*, ¶ 4). The Courthouse was built in 1794. (*Id.*). Plaintiffs allege that the memorial is situated on the very site where a slave auction block once stood. (*Id.*).

The statue was erected 50 years after the Civil War ended during the Jim Crow era. (*Id.*, ¶ 6). The statue was funded primarily by a prominent white lawyer who had repeatedly purportedly made disparaging public remarks about Black Americans and embraced the ideals of slavery. (*Id.*). No monument was erected to honor the sacrifices of those from the County who fought for the Union. (*Id.*). However, a statue honoring Frederick Douglass also stands on the Courthouse lawn, erected in or around 2011. (*Id.,* ¶¶ 42-45).

OPD is an independent state agency, created in 1971 by the Maryland legislature, and is charged with securing justice, protecting civil rights and liberty for people facing criminal prosecution. (*Id.*, ¶ 15). NAACP is a non-profit, non-partisan, corporation with over 300,000 members, including approximately 150 members residing in the County. (*Id.*, ¶ 16). It is the nation's largest and oldest grassroots-based civil rights organization. (*Id.*). Ms. Petticolas is black and is an attorney employed by OPD in the County. (*Id.*, ¶ 17). Ms. Petticolas regularly represents clients, some of whom are black, charged with criminal offenses. These proceedings take place in the County Courthouse. (*Id.*). Mr. Potter is black and is the President of the NAACP – Talbot County Branch. (*Id.*, ¶ 18). Mr. Potter grew up in the County. Mr. Potter has been directly involved in seeking the removal of the statue since 2015. *Id.* The County was established around the year 1661. (*Id.*, ¶ 19). Approximately 12.8% of residents in the County are black. (*Id.*). The County is governed by a five-member County Council, whose members are elected at-large and whose offices and meetings are located in the County Courthouse. (*Id.*).

Plaintiffs allege that when the Civil War broke out, the County was deeply divided, with scores of men fighting for both sides. (*Id.*, ¶ 26). After the Civil War ended, even though black

Americans were no longer enslaved in the County, they faced dire social and economic problems resulting from systemic racism. (*Id.*, ¶ 28). The majority of black Americans in the County were subjected to prejudice and exploitation. (*Id.*). The Complaint asserts that Maryland also enacted Jim Crow laws as early as the 1870s and there was a strong "color line" between whites and blacks in the County. (*Id.*).

The pedestal of the Talbot Boys statue was erected in 1914 and bears the names of 96 Confederate soldiers with some connection to the County. (*Id.*, ¶ 31). A copper statue was added atop the pedestal in 1916 and depicts a young soldier carrying a Confederate battle flag and wearing a belt buckle with "C.S.A." carved into it. (*Id.*, ¶ 32). The front of the base is inscribed: "To the Talbot Boys, 1861–1865, C.S.A." "C.S.A." is an acronym for the Confederate States of America.

The statue was created, in part, through the efforts of Joseph B. Seth, an Easton lawyer, who sought to commemorate soldiers from the County who fought for the Confederacy. (*Id.*, ¶ 34). Other residents had engaged in parallel efforts to raise money to erect a Union monument; however, they were unsuccessful. (*Id.*, ¶ 35).  Plaintiffs allege that at least 14 of the men whose names appear on the Talbot Boys statue owned slaves or belonged to slave-owning families. (*Id.*, ¶ 39).

Since its founding, leadership in the County was entirely white until 2007, when Councilmember Corey Pack became a member of the Council. (*Id.*, ¶ 41). The County has a complicated relationship with its past. (*Id.*, ¶ 40). Plaintiffs assert that while race relations in the County have improved significantly since the end of the Jim Crow era, there have been intermittent instances of racial hatred and violence, including specific events occurring in 1919, 1924, 1957 and 1986. (*Id.*, ¶ 41). In 2019, an investigation was necessitated by the distribution of racist

literature in the Town of St. Michaels in the County. (*Id*).

In 2015, the NAACP asked the County Council to formally consider removing the Talbot Boys statue. (*Id.*, ¶ 49). The Council held a series of public listening sessions in 2015 to discuss the removal. *Id.*, ¶ 50. The Black community overwhelmingly favored removal. *Id.* The Council unanimously voted to decline the request. (*Id.*, ¶ 51).

In 2020, Councilmember Pack introduced a resolution to have the statue removed, among other initiatives. (*Id.*, ¶ 56). Councilmember Peter Lesher supported the resolution. (*Id.*, ¶ 57). Discussions on the resolution to remove the Talbot Boys statue continued through July and early August of 2020. (*Id.*, ¶ 60). On July 28, 2020, the Council conducted a public hearing on the resolution advocating removal of the Talbot Boys statue. (*Id.*, ¶ 61). The resolution to remove the Talbot Boys statue came to a vote on August 11, 2020. (*Id.*, ¶ 62). The Council voted 3-2 to retain the monument at the courthouse. (*Id*).

Various community groups and leaders continued to organize and voice opposition to the presence of the statue. (*Id.*, ¶ 63). Requests for additional public hearings on the statue have not succeeded in gaining the support of a majority of the Council. (*Id.*).

The Complaint further alleges that in a number of instances in Maryland, Confederate imagery and symbolism have been removed from state properties. (*Id.*, ¶ 65). Similarly, the issue is being addressed at the state and federal levels elsewhere. (*Id.*, ¶ 67).

### ALLEGATIONS RELATED TO PLAINTIFFS' PURPORTED INJURIES

In ¶ 75 of the Complaint, Plaintiffs allege the following purported injuries to Ms. Petticolas: For nearly 14 years, Ms. Petticolas has, incident to her job, been obliged to pass by the statue on a

regular basis.[1] The statue is a personal affront to her as a black person. The statue is a reminder to Ms. Petticolas of stories her mother told her about past severe racial injustices. As a symbol of racism, the statue causes Ms. Petticolas anguish not only for herself but also for her clients, especially her black clients, thereby impacting her job. The statue and all that it represents makes it impossible for her clients to receive the full promise of equal rights and justice under the law. The statue tells Ms. Petticolas that the law is not equal for whites and blacks precisely because the county values whites as superior to blacks. The statue thus devalues Ms. Petticolas as a black attorney and devalues her black clients and makes it impossible for her to execute her job as fully and effectively as she is called upon to do as a public defender.

Critically, the Complaint contains no allegation that the mere presence of the statue has ever actually hindered or precluded Ms. Petticolas from representing any client in the Courthouse. Similarly, the Complaint contains no allegation that any of Ms. Petticolas's clients has received less than full measure of the law as a result of the presence of the statue on the Courthouse lawn.

In ¶ 76 of the Complaint, Plaintiffs allege the following purported injuries to the OPD: Four of OPD's six full-time employees in the County, including Ms. Petticolas, are black. As an employer, OPD is charged by law to provide a workplace free of discrimination. As a legal services agency, OPD is charged with providing legal representation to clients accused by the government of having committed crimes. Because of the Talbot Boys statue, OPD is impaired in both respects. OPD cannot provide Ms. Petticolas with a workplace free of discrimination. And, because of the placement of the statue before the entrance to the courthouse, OPD further asserts that it cannot provide its clients with the same measure of confidence in their legal representation that defendants

---

[1]   The general statute of limitations for civil actions is 3 years from the date of accrual. Thus, should any act or omission of the County be found to be actionable, Plaintiffs' claims would necessary be limited to events occurring on or after May 5, 2018.

would receive in other courthouses. Plaintiffs allege that Ms. Petticolas could never be able to assure her black clients that, within the Courthouse, they will receive all of the due process and equal protection of the law to which they are entitled by the United States Constitution—not while the legacy of slavery and white supremacy is being glorified on the front lawn.

Similar to the injury allegations made by Ms. Petticolas, the Complaint alleges no specific example where any client of either Ms. Petticolas or the OPD was deprived of due process or equal protection due to the presence of the Talbot Boys statue on the Courthouse lawn.

In ¶ 77 of the Complaint, Plaintiffs allege the following purported injuries to the NAACP: The NAACP's mission includes eliminating racial hatred and racial discrimination. The NAACP has approximately 150 members residing in the County, and for years has been speaking out against, and advocating for, the removal of the Talbot Boys statue. As an institution, the NAACP is harmed by the statue because the racism and legacy of white supremacy that it symbolizes is at the core of what the NAACP was created to fight. Its members—and at the very least its black members—are harmed because they are the direct victims of the racist symbolism the statue embodies.

In ¶¶ 78 and 79 of the Complaint, Plaintiffs allege the following purported injuries to Mr. Potter: Because he grew up in the County, the statue has been ingrained in Mr. Potter's life since his childhood, He first began to interact from an advocacy standpoint with the statue when the Frederick Douglass Honor Society wished to erect a statue of Frederick Douglass and allegedly encountered resistance from Talbot County community leaders. Through his position with the NAACP and in his personal capacity, Mr. Potter has been directly involved in seeking the removal of the Talbot Boys statue since 2015. Plaintiffs allege that the statue constitutes blatant racism sanctioned by the government. Plaintiffs contend that it is a physical reminder that black people's

7

voices and opinions are meaningless to the Council and to the County. The statue allegedly conveys a message telling Mr. Potter that the government of Talbot County is giving license to and even encouraging racial division. Mr. Potter has attempted to meet many times with the County Council to share his feelings about the statue as a black man, but some members have refused to meet with him. No meeting has successfully led towards the removal of the statue. Plaintiffs allege that since he became involved in seeking the statue's removal, Mr. Potter feels uncomfortable everywhere he goes.

## ALLEGATIONS OF THE COMPLAINT WHICH ARE IMPERTINENT TO THE RESOLUTION OF THE MOTION TO DISMISS

The County has obviously pared down the number of factual allegations in the Complaint. The County has recounted only those allegations that it contends are central to Plaintiffs' claims. Rhetoric, hyperbole, and references to the conduct of private citizens have been omitted.

## ARGUMENT

### I.      STANDARD OF REVIEW.

Even assuming the truth of all of the well-pleaded allegations in the Complaint, the County, for the reasons set forth below, contends that the Court lacks subject matter jurisdiction. Consequently, the County moves for dismissal of the Complaint in its entirety pursuant to Fed. R. Civ. P. 12(b)(1). Regarding a challenge to subject matter jurisdiction, this Court recently stated:

> A challenge to subject matter jurisdiction under Rule 12(b)(1) may proceed "in one of two ways": either a facial challenge, asserting that the allegations pleaded in the complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting " 'that the jurisdictional allegations of the complaint [are] not true.' " *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted); accord *Durden v. United States*, 736 F.3d 296, 300 (4th Cir. 2013). The plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction. *See Demetres v. East West Const., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015); *see also The Piney Run Preservation Ass'n v. Cty. Comm'rs of Carroll Cty.*, 523 F.3d 453, 459 (4th Cir. 2008); *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999).

> In a facial challenge, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns*, 585 F.3d at 192.

*Mayor & City Council of Baltimore v. Trump*, 416 F. Supp. 3d 452, 479 (D. Md. 2019). Here, the County is asserting a facial challenge to subject matter jurisdiction. In the alternative, the County also contends that the Complaint fails to state any claim upon which relief may be granted. In *Mayor & City Council of Baltimore v. Trump*, this Court stated:

> Whether a complaint [sufficiently] states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

> To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' ...." (citation omitted)); *see also Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 849 F.3d 93, 112 (4th Cir. 2017); *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted*." Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10, 135 S. Ct. 346, 346, 190 L.Ed.2d 309 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

> \*\*\*

> In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Semenova v. MTA*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943, 132 S.Ct. 402, 181 L.Ed.2d 257 (2011). But, a court is not required to accept legal conclusions drawn from the facts.

*Mayor & City Council of Baltimore v. Trump*, 416 F. Supp. 3d at 479–80.

## II.   PLAINTIFFS LACK STANDING.

This Court should dismiss the Complaint in its entirety as Plaintiffs, on several bases, lack

standing to assert the claims in the Complaint. In the words of the United States Court of Appeals

for the Fourth Circuit:

> We are not at liberty to resolve every grievance over government policy, <u>no matter how significant</u>, for "Article III of the Constitution confines the federal courts to adjudicating actual 'cases' and 'controversies.'" *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). The Supreme Court has made clear that "standing is an essential and unchanging part" of that case-or-controversy requirement, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), one that "state[s] fundamental limits on federal judicial power in our system of government," *Allen*, 468 U.S. at 750, 104 S.Ct. 3315.

*Doe v. Obama*, 631 F.3d 157, 160 (4th Cir. 2011) (emphasis added).

More recently, the Supreme Court laid out the following "preliminaries" to standing

analysis:

> As the party invoking federal jurisdiction, the plaintiffs bear the burden of demonstrating that they have standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Every class member must have Article III standing in order to recover individual damages. "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466, 136 S.Ct. 1036, 194 L.Ed.2d 124 (2016) (Roberts, C. J., concurring). Plaintiffs must maintain their personal interest in the dispute at all stages of litigation. *Davis v. Federal Election Comm'n*, 554 U.S. 724, 733, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008). A plaintiff must demonstrate standing "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S., at 561, 112 S.Ct. 2130. Therefore, in a case like this that proceeds to trial, the specific facts set forth by the plaintiff to support standing "must be supported adequately by the evidence adduced at trial." *Ibid.* (internal quotation marks omitted). And standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages). *Davis*, 554 U.S., at 734, 128 S.Ct. 2759; *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 185, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000).

*TransUnion LLC v. Ramirez*, No. 20-297, 2021 WL 2599472, at *10 (U.S. June 25, 2021)

(footnotes omitted).

This Court recently provided the following analytical framework for the purpose of evaluating whether complainants have standing to bring their claims:

> The doctrine of standing consists of two distinct "strands": constitutional standing, pursuant to Article III and prudential standing. *Elk Grove Unified Sch. Dist.*, 542 U.S. at 11, 124 S.Ct. 2301. As discussed, *infra*, "the standing inquiry asks whether a plaintiff had the requisite stake in the outcome of a case ...." *Deal v. Mercer Cty. Bd. of Educ.*, 911 F.3d 183, 187 (4th Cir. 2018) (citing *Friends of the Earth. Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)). Under Article III, "a party invoking the jurisdiction of a federal court [must] seek relief for a particularized injury," which is a requirement that "serves vital interests going to the role of the judiciary in our system of separated powers." *Hollingsworth v. Perry*, 570 U.S. 693, 696, 133 S.Ct. 2652, 186 L.Ed.2d 768 (2013).
>
> As indicated, the requirements for constitutional standing reflect that Article III "confines the federal courts to adjudicating actual 'cases' and 'controversies.'" *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), *abrogated in part on other grounds by* [*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134, 134 S. Ct. 1377, 1391, 188 L. Ed. 2d 392 (2014)]; *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ("[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III[.]"); *So. Walk at Broadlands Homeowner's Assoc. Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 185 (4th Cir. 2013) ).
>
> In addition to satisfying constitutional standing requirements, a plaintiff must also demonstrate that his claims are not barred by prudential limitations on a federal court's exercise of jurisdiction. *United States v. Windsor*, 570 U.S. 744, 133 S.Ct. 2675, 2687, 186 L.Ed.2d 808 (2013); *see also, e.g., Elk Grove Unified Sch. Dist.*, 542 U.S. at 11, 124 S.Ct. 2301; *Doe v. Sebelius*, 676 F.Supp.2d 423, 428 (D. Md. 2009). Prudential standing "'embodies judicially self-imposed limits on the exercise of federal jurisdiction.'" *Elk Grove Unified Sch. Dist.*, 542 U.S. at 11, 124 S.Ct. 2301 (citation omitted).
>
> One such limitation is that "a plaintiff generally must assert his own legal rights and interests and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). This limitation serves to "preclude a court from deciding 'questions of broad social import in cases in which no individual rights will be vindicated'" and to ensure that "'access to the federal courts [is] limited to those litigants best suited to assert the claims.'" *Buchanan v. Consolidated Stores Corp.*, 125 F.Supp.2d 730, 738 (D. Md. 2001) (quoting *Mackey v. Nationwide Ins. Co.*, 724 F.2d 419, 422 (4th

Cir. 1984)).

Under Rule 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction. *See Lujan*, 504 U.S. at 561, 112 S.Ct. 2130; *Demetres v. East West Const., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015); *Durden v. United States*, 736 F.3d 296, 300 (4th Cir. 2013). When, as here, "'standing is challenged on the pleadings, [the court will] accept as true all material allegations of the complaint and construe the complaint in favor of the complaining party.'" *Deal*, 911 F.3d at 187 (quoting *So. Walk*, 713 F.3d at 181-82); *see Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, [since] on a motion to dismiss [the court] presum[es] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130 (citation and quotation marks omitted); *accord Button v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, 892 F.3d 613, 620 (4th Cir. 2018); *Moore v. Blibaum & Assocs., P.A.*, 693 F. App'x 205 (4th Cir. 2017); NAACP, 2019 WL 355743, at *17.

*Maryland v. United States*, 360 F. Supp. 3d 288, 306–07 (D. Md. 2019).

## A.    The Complaint Fails to Allege Injury in Fact.

Regarding an injury in fact analysis, this Court has stated:

To establish Article III standing, a plaintiff must satisfy three elements. See *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130. They are:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Maryland v. United States*, 360 F. Supp. 3d 288, 307 (D. Md. 2019).

 "To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." [*Spokeo, Inc. v. Robins*, —— U.S. ——, 136 S.Ct. 1540, 1548, 194 L.Ed.2d 635 (2016). (internal quotation marks omitted). "For an injury to be 'particularized,' it must affect the plaintiff in a personal and individual way." *Id.* In contrast, for an injury to be "concrete," it "must be *de facto*;

that is, it must actually exist." *Id.* (internal quotation marks omitted). "'Concrete' is not, however, necessarily synonymous with 'tangible[,]' ... and intangible injuries can nevertheless be concrete." *Id.* at 1549. In particular, the injury-in-fact requirement is not limited simply to financial or economic losses. *Pender v. Bank of Am. Corp.*, 788 F.3d 354, 366 (4th Cir. 2015). However, "a bare procedural violation, divorced from any concrete harm," does not "satisfy the injury-in-fact requirement of Article III." *Spokeo*, 136 S.Ct. at 1549.

*Moore v. Blibaum & Assocs.*, P.A., 693 F. App'x 205, 206 (4th Cir. 2017) (per curiam).

Here, Ms. Petticolas has alleged that the statue represents a "personal affront," a "reminder" of past acts of racial violence, that it "impacts her ability to do her job, and that it "makes it impossible for her clients to receive the full promise of equal rights and justice under the law." (ECF Doc. 1, ¶ 75)[2]. Similarly, Mr. Potter has alleged that the statue is a "harsh physical reminder that black people's voices and opinions are meaningless to the Council and to the County." (*Id.*, ¶ 78). Mr. Potter also alleges that the statue is "giving license to and even encouraging racial divide." (*Id.*, ¶ 79). The NAACP alleges that it and its members are harmed by the statue because it represents "racism and [the] legacy of white supremacy." (*Id.*, ¶ 77). The OPD alleges that the statue's "racially charge symbolism" impairs the OPD's ability to provide adequate legal services to its clients as well as to provide a workplace free from racial discrimination. (*Id.*, ¶ 76).

In sum, the injuries alleged are derived solely from the location of the statue, and how that location allegedly impacts the various Plaintiffs upon observing it. However, mere offense through observation of a statue does not confer standing to sue:

This "offended observer" theory of standing has no basis in law. Federal courts may decide only those cases and controversies that the Constitution and Congress have

---

[2]  The nature and extent of the latter allegation is difficult to ascertain in the absence of any particularized example. The Complaint is utterly devoid of any allegations that Ms. Petticolas's clients have been denied the administration of justice and/or that the members of the bench of the Circuit Court for Talbot County have failed to discharge their duties to administer justice fairly to all.

authorized them to hear. And to establish standing to sue consistent with the Constitution, a plaintiff must show: (1) injury-in-fact, (2) causation and (3) redressability. The injury-in-fact test requires a plaintiff to prove "an invasion of a legally protected interest which is (a) concrete and particularized ... and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotation marks omitted).

*Am. Legion v. Am. Humanist Ass'n*, ___ U.S. ___ 139 S. Ct. 2067, 2098, 204 L. Ed. 2d 452 (2019)

(Gorsuch, J., concurring in judgment). In *Am. Legion v. Am. Humanist Ass'n.*, Justice Gorsuch

then made the following pertinent analogy:

> Proceeding on these principles, this Court has held offense alone insufficient to convey standing in analogous—and arguably more sympathetic—circumstances. Take Allen v. Wright, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), where the parents of African-American schoolchildren sued to compel the Internal Revenue Service to deny tax-exempt status to schools that discriminated on the basis of race. The parents claimed that their children suffered a "stigmatic injury, or denigration" when the government supported racially discriminatory institutions. Id., at 754, 104 S.Ct. 3315. But this Court refused to entertain the case, reasoning that standing extends "only to those persons who are personally denied equal treatment by the challenged discriminatory conduct." Id., at 755, 104 S.Ct. 3315 (internal quotation marks omitted). Now put the teachings there alongside the Association's standing theory here and you get this utterly unjustifiable result: An African-American offended by a Confederate flag atop a state capitol would lack standing to sue under the Equal Protection Clause, but an atheist who is offended by the cross on the same flag could sue under the Establishment Clause. Who really thinks that could be the law?

*Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. at 2099, 204 L. Ed. 2d 452.

Here, Plaintiffs seemingly attempt to allege stigmatic injury, based solely upon how they

*feel* merely as result of the statue's presence. However, such feelings do not confer standing to

bring these claims:

> a "stigmatizing injury often caused by racial discrimination" is the type of noneconomic injury that "is sufficient in some circumstances to support standing." [*Allen v. Wright*, 468 U.S. 737, 755, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)] However, "such injury accords a basis for standing only to "those persons who are personally denied equal treatment" by the challenged discriminatory conduct. *Id*. (quoting *Heckler v. Mathews*, 465 U.S. 728, 740, 104 S.Ct. 1387, 79 L.Ed.2d 646 (1984)).

14

*Stone v. Trump*, 400 F. Supp. 3d 317, 344 (D. Md. 2019). In short, there are *no* allegations in the Complaint from which this Court could reasonably infer that either the observational injuries or the stigmatization described has led to an *actual* denial of equal treatment.

The case of *Moore v. Bryant*, 853 F.3d 245 (5th Cir. 2017), is directly on point. In *Moore*, the United States Court of Appeals for the Fifth Circuit affirmed dismissal of a complaint for lack of standing. The complaining party, a black attorney in Mississippi, complained that the (then) state flag, bore, in one corner, the Confederate battle flag. As a result, the plaintiffs claimed that the flag, to which he was "unavoidably exposed," amounted to a message that was "'painful, threatening and offensive' to him, [made] him 'feel like a second-class citizen,' and caused him both physical and emotional injuries." *Id.*, 853 F.3d at 249. In the Court's words, "[a]t its core, Plaintiff's injury theory is that the Mississippi state flag stigmatizes him." *Id.*

Affirming dismissal of the case on a lack of standing, the Fifth Circuit reasoned:

> Stigmatic injury "accords a basis for standing only to 'those persons who are personally denied equal treatment' by the challenged discriminatory conduct[.]" *Allen v. Wright*, 468 U.S. 737, 755, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (quoting *Heckler v. Mathews*, 465 U.S. 728, 739–40, 104 S.Ct. 1387, 79 L.Ed.2d 646 (1984)), *abrogated in part on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, ⸻ U.S. ⸻, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014). Accordingly, to plead stigmatic injury standing, Plaintiff must plead that he was personally subjected to discriminatory treatment. *See Carroll v. Nakatani*, 342 F.3d 934, 946 (9th Cir. 2003) ("Being subjected to a racial classification differs materially from having personally been denied equal treatment.... [Plaintiff] does not cite, and we do not find, any authority supporting the proposition that racial classification alone amounts to a showing of individualized harm."); *see also Miller v. Albright*, 523 U.S. 420, 451, 118 S.Ct. 1428, 140 L.Ed.2d 575 (1998) (O'Connor, J., concurring); *Binno v. Am. Bar Assoc.*, 826 F.3d 338, 351 (6th Cir. 2016); Rainbow/PUSH Coal. v. F.C.C., 396 F.3d 1235, 1241 n.6 (D.C. Cir. 2005); *Wilson v. Glenwood Intermountain Props., Inc.*, 98 F.3d 590, 596 (10th Cir. 1996); *Kurtz v. Baker*, 829 F.2d 1133, 1141 (D.C. Cir. 1987). He has not done so and thus, fails to plead injury.

*Id.* (emphasis added). The County respectfully suggests that the reasoning in *Moore* is sound and

legally correct. And, this reasoning compels the dismissal of the instant Complaint for lack of

Article III standing. Stated another way, even if the Court assumes the truth allegations of

Plaintiffs' injury allegations, which it must, such allegations are insufficient to confer standing as

a matter of law because they fail to describe even a single instance describe of actual discriminatory

treatment directed towards them or anyone else. As such, the Complaint is ripe for dismissal.

### B.      The Complaint Fails to Allege Particularized Injury.

In *Carney v. Adams*, ___ U.S. ____, 141 S. Ct. 493, 208 L. Ed. 2d 305 (2020), a Delaware

attorney, who was registered as a political independent, brought an action against Delaware's

Governor, challenging under the First Amendment right to association, the provisions of the

Delaware Constitution limiting judgeships on state courts to a bare majority of applicants from

one of the two major political parties, and requiring the rest of the judges on some of those courts

to be applicants from the other major political party. *Carney* is of importance here because of its

analysis of when an alleged injury is particularized or, more properly, characterized as an injury

too generalized to provide standing. In *Carney*, the Supreme Court said:

> [A] grievance that amounts to nothing more than an abstract and generalized harm
> to a citizen's interest in the proper application of the law does not count as an
> "injury in fact." And it consequently does not show standing. [*Hollingsworth v.
> Perry*, 570 U.S. 693, 706, 133 S. Ct. 2652, 2662, 186 L. Ed. 2d 768 (2013); *see
> also Lance v. Coffman*, 549 U.S. 437, 439–441, 127 S.Ct. 1194, 167 L.Ed.2d 29
> (2007) (per curiam) (describing this Court's "lengthy pedigree" in refusing to serve
> as a forum for generalized grievances).
>
> In other words, a plaintiff cannot establish standing by asserting an abstract
> "general interest common to all members of the public," id., at 440, 127 S.Ct. 1194,
> "no matter how sincere" or "deeply committed" a plaintiff is to vindicating that
> general interest on behalf of the public." *Hollingsworth*, *supra*, at 706–707, 133
> S.Ct. 2652. Justice Powell explained the reasons for this limitation. He found it
> "inescapable" that to find standing based upon that kind of interest "would
> significantly alter the allocation of power at the national level, with a shift away
> from a democratic form of government." *United States v. Richardson*, 418 U.S.
> 166, 188, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974) (concurring opinion). He added
> that "[w]e should be ever mindful of the contradictions that would arise if a

democracy were to permit general oversight of the elected branches of government by a nonrepresentative, and in large measure insulated, judicial branch." *Ibid*.; *see also Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 222, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). *Cf. Federal Election Comm'n v. Akins*, 524 U.S. 11, 21–25, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998) (finding standing where a group of voters suffered concrete, though widespread, harm when they were prevented from accessing publicly disclosable voting-related material).

*Carney*, ___ U.S. ___ 141 S. Ct. at 498–99, 208 L. Ed. 2d 305 (emphasis added).

On this same subject, the Supreme Court recently stated:

if the law of Article III did not require plaintiffs to demonstrate a "concrete harm," Congress could authorize virtually any citizen to bring a statutory damages suit against virtually any defendant who violated virtually any federal law. Such an expansive understanding of Article III would flout constitutional text, history and precedent. In our view, the public interest that private entities comply with the law cannot "be converted into an individual right by a statute that denominates it as such, and that permits all citizens (or, for that matter, a subclass of citizens who suffer no distinctive concrete harm) to sue." *Lujan*, 504 U.S., at 576–577, 112 S.Ct. 2130.

*TransUnion LLC v. Ramirez*, 2021 WL 2599472, at *9. (U.S. June 25, 2021)

Here, the fact that Plaintiffs' claims are generalized is established by their own words, wherein they decry the effect of the statue on Ms. Petticolas' and the OPD's clients, the non-party members of the NAACP, the black population of the County and the public generally. (ECF Doc. 1, ¶¶ 5, 15, 17, 21, 23, 74, 75, 76, 77, 79, 88, 111, 114 & 131). Thus, because the claims of the Complaint are inextricably pleaded on behalf of that general population of non-parties, the Complaint must and should be dismissed in its entirety:

One such limitation is that "a plaintiff generally must assert his own legal rights and interests and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). This limitation serves to "preclude a court from deciding 'questions of broad social import in cases in which no individual rights will be vindicated'" and to ensure that "'access to the federal courts [is] limited to those litigants best suited to assert the claims.'" *Buchanan v. Consolidated Stores Corp.*, 125 F. Supp. 2d 730, 738 (D. Md. 2001) (quoting *Mackey v. Nationwide Ins. Co*., 724 F.2d 419, 422 (4th Cir. 1984)).

*Mayor & City Council of Baltimore v. Trump*, 416 F. Supp. 3at 484 (emphasis added).

**C.    The Issue of the Effect and Meaning of the Statue is a Political Question Best Left to Resolution by a Branch of Government Other than The Judiciary.**

The County respectfully submits that the issues raised by the Complaint are inherently local and not ones calling for the intervention of a federal court. This is so because the question of when, or where, Confederate symbology transgresses into an area of unlawfulness transcends judicial determination, just as does fashioning manageable judicial standards for resolution.

Guidance on the political question doctrine appears in the following analytical framework:

> The political question doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986). However, this is a "narrow exception" to judicial review. *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195, 132 S.Ct. 1421, 182 L.Ed.2d 423 (2012). Whether a case presents a non-justiciable political question depends on a number of factors, the most important of which are whether there exists a "textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it." *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

*Kravitz v. United States Dep't of Com.*, 336 F. Supp. 3d 545, 561 (D. Md. 2018).

In *Rucho v. Common Cause*, ___ U.S. ___, 139 S. Ct. 2484, 204 L. Ed. 2d 931 (2019), North Carolina and Maryland challenged their states' congressional districting maps as unconstitutional partisan gerrymanders. In a 5-4 decision, the Supreme Court held that partisan gerrymandering claims present political questions beyond the reach of the federal courts. *Rucho* is pertinent here in that the question of partisan gerrymandering, which is undoubtedly state action, has negative implications for addressing racial disparity in the United States in an arguably much greater magnitude than the presence of Confederate symbology on public land.

The *Rucho* Court's analysis included the following introductory framework:

18

Article III of the Constitution limits federal courts to deciding "Cases" and "Controversies." We have understood that limitation to mean that federal courts can address only questions "historically viewed as capable of resolution through the judicial process." *Flast v. Cohen*, 392 U.S. 83, 95, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). In these cases we are asked to decide an important question of constitutional law. "But before we do so, we must find that the question is presented in a 'case' or 'controversy' that is, in James Madison's words, 'of a Judiciary Nature.'" *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006) (quoting 2 Records of the Federal Convention of 1787, p. 430 (M. Farrand ed. 1966)).

Chief Justice Marshall famously wrote that it is "the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 1 Cranch 137, 177, 2 L.Ed. 60 (1803). Sometimes, however, "the law is that the judicial department has no business entertaining the claim of unlawfulness—because the question is entrusted to one of the political branches or involves no judicially enforceable rights." *Vieth v. Jubelirer*, 541 U.S. 267, 277, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004) (plurality opinion). In such a case the claim is said to present a "political question" and to be nonjusticiable—outside the courts' competence and therefore beyond the courts' jurisdiction. *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Among the political question cases the Court has identified are those that lack "judicially discoverable and manageable standards for resolving [them]." *Ibid.*

Last Term in *Gill v. Whitford*, we reviewed our partisan gerrymandering cases and concluded that those cases "leave unresolved whether such claims may be brought." 585 U.S., at ——, 138 S.Ct., at 1929. This Court's authority to act, as we said in *Gill,* is "grounded in and limited by the necessity of resolving, according to legal principles, a plaintiff's particular claim of legal right." *Ibid.* The question here is whether there is an "appropriate role for the Federal Judiciary" in remedying the problem of partisan gerrymandering—whether such claims are claims of legal right, resolvable according to legal principles or political questions that must find their resolution elsewhere. *Id.*, at ——, 138 S.Ct., at 1926–1937.

*Rucho*, ___ U.S. ___, 139 S. Ct. at 2493–94, 204 L. Ed. 2d 931.

Here, Plaintiffs are asking the Court to consider questions which are eminently more capable of being resolved by broader societal expressions, including those expressed at the ballot-box, than in the judiciary. The "'law of Art. III standing is built on a single basic idea—the idea of separation of powers.'" *TransUnion LLC v. Ramirez*, 2021 WL 2599472, at *6 (quoting *Raines v. Byrd*, 521 U.S. 811, 820, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) (internal quotation marks

omitted in the original). The fact that Plaintiffs have yet to be successful in effecting the removal the statue does not change the analysis. One rhetorical question arising from the Complaint is whether, should Plaintiffs succeed, it would follow that all Confederate or even other symbology must be removed from all publicly owned land as violating the rights of any individuals sincerely offended by its existence in any venue. As noted in the Complaint, and among other examples, Congress is currently grappling with the issue of renaming certain military bases. Complaint, ¶¶ 65-67. The County respectfully submits that the examples Plaintiffs cite constitute examples of more appropriate forums and methods for resolving the issue presented to this Court; *i.e.*, whether and how a statue should be removed.

## III.   PLAINTIFFS HAVE FAILED TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

### A.   Plaintiffs Fail to State a Claim of Violation of Their Rights to Equal Protection.

As to Count I, the County maintains that the claim fails for lack of standing as to all Plaintiffs. Additionally, as to the OPD, the claim fails due to the fact that it has no *bona fide* comparators against which it might be able to demonstrate that it has been subjected to differential treatment. At the very minimum, Count I may be dismissed as to OPD on this basis alone.

### B.   Count II Fails for a Lack of Factual Allegations Necessary to Assert the Claim.

Count II, "Violation of Fundamental Rights Arising Under the First and Fourteenth Amendment to the U.S. Constitution, Actionable Under 42 U.S.C. § 1983," fails as inapplicable to these Plaintiffs and/or these circumstances. Central to their claim, Plaintiffs assert:

> Talbot County's placement of the Talbot Boys statue on the courthouse grounds—
> outside the primary building where the County Council meets and where the court
> system operates—deprives its Black residents, in particular, of the equal exercise
> of their protected rights to petition their government and to access the judicial
> process as a result of their having to walk by and stare down the Talbot Boys statue
> representing the Confederate cause of slavery and white supremacy any time they
> are required to enter the courthouse—for example, to answer for criminal charges,

20

> to attend County Council meetings, or even just (if married but seeking a divorce) to petition for a divorce.

(ECF Doc. 1, ¶ 95). Certainly, Ms. Petticolas and the OPD have not been denied access to the Circuit Court for Talbot County, and there are no allegations that Mr. Potter or the NAACP have been denied the right to petition or access either the County or the Circuit Court. Thus, to the extent Count II is asserted on behalf of black residents of the Count (as indicated in ¶ 95), Plaintiffs have failed to assert in what manner they have standing to sue on behalf of those residents. Plaintiffs have further failed to identify any occasion that, because of the mere presence of the Talbot Boys statue, any Plaintiff or other member of the public was denied access to the Circuit Court or prevented in any way from petitioning the County for redress.

To the extent that this claim is derived from a single instance where Mr. Potter's public comments allegedly were cut short during a Council meeting, the claim is offset by Mr. Potter's other allegations that he frequently attends Council meetings, that he has been involved in efforts to remove the statue for years, and that he has met with some, but not all, of the Councilmembers to address this issue. Complaint, ¶ ¶ 19, 78 & 79. In sum, these allegations are simply insufficient to allow Count II to advance.

### C.    Count III Fails for Essentially the Same Reasons as Count II.

Count III, "Race Discrimination in Violation of Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a," fails as it is inapplicable either to these Plaintiffs and/or these circumstances. The "overriding purpose" of this provision is to remove "the daily affront and humiliation involved in discriminatory denials of access to facilities ostensibly open to the general public." *Daniel v. Paul*, 395 U.S. 298, 307–08 (1969). The statutory provision has been applied traditionally to parks, theaters, restaurants, public transportation and the like. Thus, Plaintiffs include allegations of park-like activities to the Courthouse lawn. Complaint, ¶ 102. Notably, however, there are no allegations

21

that any Plaintiff has ever been *excluded* from the events described in ¶ 102 of the Complaint. Rather, it is merely implied that Plaintiffs *might not have participated* because of the statue. Such allegations are insufficient.

Further, Count III also fails due to the absence of allegations that any Plaintiff was excluded from the listed activities on the Courthouse lawn or, for that matter, excluded from the Courthouse itself, or any of the services it provides, for any reason whatsoever.

### D.    Count IV is Also Subject to Dismissal Due to the Insufficiency of the Allegations.

Count IV is based on ¶ 110 of the Complaint, which states in its entirety: "Defendant receives federal financial assistance and is subject to Title VI requirements." (ECF Doc. 1, ¶110). This legal conclusion is not enough to allow the claim to move forward. A relatively recent opinion from the United States District Court for the District of Minnesota provides persuasive guidance here:

> Title VI provides, as relevant here, that "[n]o person in the United States shall, on the ground of race, color or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Title VI prohibits intentional discrimination, not discrimination arising from disparate impact. *Alexander v. Sandoval*, 532 U.S. 275, 280, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001); *accord Mumid v. Abraham Lincoln High Sch.*, 618 F.3d 789, 794 (8th Cir. 2010). Private individuals may sue to enforce this aspect of Title VI and obtain both damages and injunctive relief. *Sandoval*, 532 U.S. at 279, 121 S.Ct. 1511.
>
> To prevail on a Title VI claim, a plaintiff must be an "intended beneficiary" of a federally funded "program or activity." *Carmi v. Metro. St. Louis Sewer Dist.*, 620 F.2d 672, 674 (8th Cir. 1980) ("Congress did not intend to extend protection under [T]itle VI to any person other than an intended beneficiary of federal financial assistance."), *abrogated on other grounds by Consol. Rail Corp. v. Darrone*, 465 U.S. 624, 104 S.Ct. 1248, 79 L.Ed.2d 568 (1984); *accord Unity Healthcare, Inc. v. Cty. of Hennepin*, No. 14-CV-114, 2014 WL 6775293, at *8 (D. Minn. Dec. 2, 2014) (dismissing Title VI claim because plaintiffs did not sufficiently plead that they were intended beneficiaries of the federally funded program). This requires a nexus between the alleged discrimination and a specific program or activity that receives federal funding. *Cf. Consol. Rail Corp.*, 465 U.S. at 636, 104 S.Ct. 1248

(discussing analogous language in Rehabilitation Act, observing that "[c]learly, this language limits the ban on discrimination to the specific program that receives federal funds"); *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 536-38, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982) (discussing same in context of Title IX); *Jackson v. Conway*, 476 F. Supp. 896, 900 (E.D. Mo. 1979) (observing that when a municipal program receives federal funding, Title VI requires "that the service or program involved be provided in a non-discriminatory manner" (emphasis added) ), *aff'd per curiam*, 620 F.2d 680 (8th Cir. 1980).

*Ash v. City of Duluth*, 331 F. Supp. 3d 935, 939 (D. Minn. 2018).

Here, the Complaint fails to identify any program or activity from which Plaintiffs were excluded or that Plaintiffs were an intended beneficiary of any such unidentified programs or activities. Furthermore, at least one United States District Court has found that a municipality does *not* fall within the definition of "program" as defined by Title VI. *See Hodges by Hodges v. Pub. Bldg. Comm'n of Chicago*, 864 F. Supp. 1493, 1505 (N.D. Ill. 1994) (examining 42 U.S.C. § 2000d–4a and finding that the City of Chicago City was a municipality and, as such, did not fit within the definition of program or activity for purposes of Title VI).

In sum, this Court is not bound by the legal conclusion set forth in ¶ 110 of the Complaint. And, due to the absence of any other allegations from which the Court might conclude that the County satisfies the definition as a "program or activity," and/or which might indicate that any Plaintiff was the intended beneficiary of such program and were denied the benefits, Count IV should be dismissed.

### E.      No Direct Cause of Action Exists Against the County Under 42 U.S.C. § 1981.

Count V, "Race Discrimination in Violation of 42 U.S.C. § 1981," is subject to dismissal under established case law providing that § 1981 is an inappropriate vehicle to bring such a claim when the same claim may be asserted under § 1983:

> No direct cause of action exists under § 1981 against a municipality. The right of action under § 1983 is the exclusive federal damages remedy for violation of rights guaranteed by § 1981 when the claim is pressed against a state actor. *See Jett v.*

23

*Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *Dennis v. County of Fairfax*, 55 F.3d 151, 156 (4th Cir.1995).

*Bradley v. Baltimore Police Dep't*, 887 F. Supp. 2d 642, 646–47 (D. Md. 2012). Under the authority of *Jett* and *Dennis*, Count V should be dismissed.

      **F.**     **Plaintiff's State Constitutional Equal Protection Claim Fails for the Same Reason as Plaintiffs' Federal Equal Protection Claim.**

Count VI is entitled "Violation of the Maryland Constitution – Art. 24, Maryland Declaration of Rights, Equal Protection and Due Process." Although Article 24 does not contain an express equal protection clause, the concept of equal protection nevertheless is embodied in the Article.'" *Frankel v. Bd. of Regents of Univ. of Maryland Sys*., 361 Md. 298, 312–13, 761 A.2d 324, 332 (2000) (quoting *Renko v. McLean*, 346 Md. 464, 482, 697 A.2d 468, 477 (1997)). "The Maryland equal protection principle applies 'in a like manner and to the same extent as' the federal Equal Protection Clause." *Branch v. McGeeney*, 123 Md. App. 330, 361, 718 A.2d 631, 646 (1998) (quoting *Murphy v. Edmonds*, 325 Md. 342, 354, 601 A.2d 102 (1992)). While the parallel provisions are "capable of divergent application" (*Frankel*, 361 Md. at 313, 761 A.2d at 332) there is no basis articulated in the Complaint to engage in a divergent analysis and Count VI should be dismissed on the same grounds set forth in Section III (A) above.

      **G.**     **No Private Cause of Action is Engendered by Article 44 of the Maryland Declaration of Rights.**

Article 44 of the Maryland Declaration of Rights, entitled, "War time application of Constitutions," provides in its entirety:

> That the provisions of the Constitution of the United States, and of this State, apply, as well in time of war, as in time of peace; and any departure therefrom, or violation thereof, under the plea of necessity or any other plea, is subversive of good Government, and tends to anarchy and despotism.

By its plain language, the provision is merely meant to insure that constitutional protections remain

in place during times of war. No private cause of action is contemplated. Even if it were otherwise, a point not even remotely conceded, Article 44 has no application outside a "time of war." As such, this claim must be dismissed.[3]

> **H.      There Has Been No Violation of Article 15 of the Maryland Declaration of Rights.**

In its entirety, Article 15 provides:

> That the levying of taxes by the poll is grievous and oppressive and ought to be prohibited; that paupers ought not to be assessed for the support of the government; that the General Assembly shall, by uniform rules, provide for the separate assessment, classification and sub-classification of land, improvements on land and personal property, as it may deem proper; and all taxes thereafter provided to be levied by the State for the support of the general State Government, and by the Counties and by the City of Baltimore for their respective purposes, shall be uniform within each class or sub-class of land, improvements on land and personal property which the respective taxing powers may have directed to be subjected to the tax levy; yet fines, duties or taxes may properly and justly be imposed, or laid with a political view for the good government and benefit of the community.

By its plain language, the provision is designed generally to prevent improper forms of taxation,

---

[3] The point is further emphasized by undersigned counsel's research which indicates that the provision has only been cited in 3 cases. In 2 of the 3, the provision is only mentioned in passing, asserted along with other authorities as a "kitchen sink" form of pleading without any real development, application or success. *See Avery v. State*, 15 Md. App. 520, 536, 292 A.2d 728, 740 (1972) and *U.S. Mortg. Co. v. Matthews*, 167 Md. 383, 173 A. 903, 907, *rev'd*, 293 U.S. 232, 55 S. Ct. 168, 79 L. Ed. 299 (1934). In the third case, the subject provision does come into play, but solely as the basis upon which the court upheld a foreclosure sale during the Great Depression. Thus, in *Kenly v. Huntingdon Bldg. Ass'n*, 166 Md. 182, 170 A. 526 (1934), the court framed the controversy as follows:

> The real ground of contention of the appellee, and that sustained by the chancellor, is that, by reason of the depressed economic conditions prevailing at the present time, and especially in respect to the real estate market, it would be inequitable and unjust for a court of equity to permit the enforcement of the legal rights of the appellant.

*Id.* at 528. The *Kelly* Court, unsurprisingly, found that, pursuant to Article 44, it was bound to apply foreclosure law in spite of the emergent nature of the distressed economy.

and not, as Plaintiffs would have it here, the control the expenditure of taxes collected. Plaintiffs

deploy a circular argument in an attempt to bring their claims within the provision:

> Talbot County's expenditures on the maintenance and protection of the Talbot Boys
> statue violates multiple constitutional and statutory provisions, including those
> identified in this Complaint, and on this independent ground makes the continued
> maintenance and protection of the statue unconstitutional under the Maryland
> Constitution.

Complaint, ¶ 126. Plaintiffs effectively concede that the claim is derivative and based on the other

causes of action. Because those claims fail, so too does Count VIII.

## I.      The County is Immune from the Common Law Tort Claim in Count IX.

Count IX, entitled "Tortious Interference With Contract," must be dismissed on the

grounds that the County is afforded governmental immunity from this common law tort claim.

"Certain well-established rules apply to tort actions filed against local governments and their

employees and officials." *DiPino v. Davis*, 354 Md. 18, 47, 729 A.2d 354, 369 (1999). "Under

Maryland common law, a local government is immune from tort liability when it functions in a

'governmental' capacity, but it enjoys no such immunity when it is engaged in activities that are

'proprietary' or 'private' in nature." *Zilichikhis v. Montgomery Cty.*, 223 Md. App. 158, 192, 115

A.3d 685, 705 (2015); *see also Austin v. City of Balt.*, 286 Md. 51, 53, 405 A.2d 255, 256 (1979)

("Unlike the total immunity from tort liability which the State and its agencies possess, the

immunity of counties, municipalities and local agencies is limited to tortious conduct which

occurred in the exercise of a 'governmental' rather than a 'proprietary' function."); *Rios v.

Montgomery Cty.*, 386 Md. 104, 124, 872 A.2d 1, 12 (2005).

As a matter of decided law, the operation of a courthouse is governmental function. *See

Bagheri v. Montgomery Cty.*, 180 Md. App. 93, 101, 949 A.2d 1, 6 (2008) ("Running the

courthouse was a 'governmental' function and therefore the County was entitled to immunity from

any tort actions arising from the operation of the courthouse.") (citing *Heffner v. Montgomery Cty.*, 76 Md. App. 328, 335, 545 A.2d 67, 70 (1988) ("The pellucid import of this language is that the function of a courthouse is, as a matter of law, a 'governmental' function.")). Thus, Count IX is barred by the governmental immunity afforded the County.

Additionally, and alternatively, Count IX is subject to dismissal for failure to provide and/or to plead satisfaction of the notice provision of the Local Government Tort Claims Act, § 3-504(b)(1) of the Courts Article, as a condition precedent to maintaining this claim. *See Hansen v. City of Laurel*, 420 Md. 670, 694, 25 A.3d 122, 137 (2011) ("If a plaintiff omits this step, he or she is subject to a motion to dismiss, for instance, based on a failure to state a claim upon which relief can be granted.").

For these reasons, Count IX should be dismissed.

## IV.   ALL CLAIMS ARE BARRED BY LIMITATIONS.

As noted above, the limitations period on all civil claims is, at most, three (3) years. "A civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced." § 5-101 of the Courts Article. *See Burley v. Baltimore Police Dep't.*, 422 F. Supp. 3d 986, 1017 (D. Md. 2019) ("to determine whether a § 1983 claim was timely filed, courts look to the statute of limitations from the most analogous state-law cause of action."); *Carter v. Univ. of Washington Sch. of Dentistry*, No. C21-0401JLR, 2021 WL 1338482, at *2 (W.D. Wash. Apr. 9, 2021) ("Because Title II does not specify a time limit for bringing an action, courts look to the state statute of limitations for personal injury action[.]"); *Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 187 (4th Cir. 1999) ("We therefore agree with our sister circuits that have considered the question that the personal nature of the right against discrimination justifies

applying the state personal injury limitations period to Title VI claims.").

The Complaint alleges that Ms. Petticolas has "been obliged to pass by" the statue for fourteen (14) years. (ECF Doc. 1, ¶ 75). The OPD's alleged injuries are coextensive, at least, with the injuries alleged by Ms. Petticolas. (*Id.* (citing Ms. Petticolas experience as an example)). Mr. Potter allegedly has been "directly involved with removal of the statue since 2015" and became aware of its meaning when he was first involved with advocating for a statue of Frederick Douglass. (*Id.*, ¶ 78). The NAACP has been "for years" speaking out against and advocating for removal of the statue, and its injuries must be, at least, coextensive with Mr. Potters. *Id.*, ¶ 77.

There can be no bona fide dispute that if Plaintiffs incurred an actionable injury, a point not conceded, the cause of action accrued when Plaintiffs first observed the statue as an offensive symbol, which, on the face of the Complaint occurred for all Plaintiffs well before the limitations period for Complaint began to run.

## **CONCLUSION**

The law governing this Complaint establishes Plaintiffs lack standing to bring any of the claims asserted. And, even if standing were not an issue, Plaintiffs have failed to state any claim upon which relief may be granted. For these reasons, the Complaint should be dismissed in its entirety.

Respectfully submitted,

KARPINSKI, CORNBROOKS & KARP, P.A.

BY:        /s/ Kevin Karpinski
           KEVIN KARPINSKI
           CPF #9312150114

BY:        /s/ Michael Rynd
           MICHAEL RYND, #28765
           CPF #0612130284

120 East Baltimore Street
Suite 1850
Baltimore, Maryland 21202-1617
410-727-5000
kevin@bkcklaw.com
*Counsel for Defendant Talbot County,*
*Maryland*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 30th day of June 2021, a copy of the foregoing was

electronically filed with notice to:

Deborah A. Jeon, Esquire
American Civil Liberties Union
Foundation of Maryland
3600 Clipper Mill Road
Suite 350
Baltimore, Maryland 21211

Daniel W. Wolff, Esquire
David Ervin, Esquire
Kelly H. Hibbert, Esquire
Eric Ashby, Esquire
Crowell & Moring LLP
1001 Pennsylvania Avenue NW
Washington, D.C. 20004

Suzanne Trivette, Esquire
Crowell & Moring LLP
590 Madison Avenue
20th Floor
New York, New York 10022-2544

Tiffanie McDowell, Esquire
Crowell & Moring LLP
3 Park Plaza, 20th Floor
Irvine, California 92614
***Counsel for Plaintiffs***

                                                          _____/s/ Kevin Karpinski_____
                                                  *Counsel for Defendant Talbot County,*
                                                  *Maryland*